Anderson, J.
This is an application of a debtor, to a court of equity, for relief on a contract made between the 1st of January 1862 and the 10th of April 1865„ The bill alleges that plaintiff, who is appellant here, was the purchaser of three adjoining lots in the city of Richmond, having a front on Franklin street of twenty-six feet each, which were exposed to sale at public auction on the 5th day of February 1862, by their joint owners, Richard Whitfield and John F. Whitfield, at the price of $148 per front foot, aggregating $11,154. That agreeably' to the terms of the sale, he paid one-fourth of the purchase money down, in Confederate money, and gave his three several notes, in equal amounts, payable in one, two and three years, with interest, for the remaining three-fourths. That thereupon the vendors conveyed him the title, and he gave them a deed of trust upon the lots to secure the deferred payments. That he *782 paid the two first notes, as they fell due, in Confederate and tendered payment of the last note, at its maturity on the 5th of February 1865, in Confederate States treasury notes; which .Richard Whitfield, the ^ben bolder and owner of the note,refused to receive.
The bill also alleges that plaintiff applied to the court of conciliation in the city of Richmond for the adjustment of the controversy. And that said court, on the 30th of October 1865, decided that plaintiff should pay to defendant $85.37, in full discharge of said note, and of the interest which had accrued thereon, to the date of said judgment, in Federal currency: which sum plaintiff was ready and offered to pay ; but the said Richard refused to receive it. He insists that the defendant is concluded from demanding any more than was awarded him by said court, because: 1st, It is a res adjudicóla ; and 2d, Because the decision was just and right.
The answer takes issue upon these pretensions of the bill. The Circuit court held that it was a Confederate contract; but that the scale should be applied at the date of the contract, and decreed that the plaintiff should pay to the defendant $2,308.40, with interest from the 5th day of February 1862, and his costs. From that decree an appeal was allowed the plaintiff' to this court. And the defendant has filed a petition for a cross appeal, upon the ground that the decree is erroneous, in not allowing him the face of the note.
The first question that meets us is, is the defendant concluded by the judgment of the court of conciliation ? That court seems to have been established by the military power, then dominant in this state, as a temporary expedient, to arbitrate and adjust disputes between citizens during the suspension of the civil authority. It Was'composed'of gentlemen of learning and ability, one of whom is a distinguished member of this bar; and the other afterwards presided in one of the Circuit courts of this Commonwealth. This decision might be sugges *783 tive of what was right, and entitled to a persuasive influence ; but could only be advisory. It could not have the force of an award, although the gentlemen;'composing the court were authorized by the order to arbitrate, it not being shown that the appellant consented to the submission to their arbitrament. The answer denies that he consented, and alleges that he protested against the jurisdiction of the court. Can it have the force of a judgment ? The military order does not seem to contemplate it, as it authorizes the appointees to “ arbitrate ”; and expressly provides that its decisions shall be no bar to legal remedies, when the civil laws and civil courts are re-established. It seems to have been designed in its institution to enlighten the conscience of the military commander, who doubtless needed enlightenment ; for it seems that its decisions could only be enforced at his pleasure. The decisions of such a tribunal cannot be binding upon the judicial tribunals of the state, and cannot conclude the appellant in this case.
Section 4, chap. 71, of the act passed March 3, 1866, acts of 1865-6, p. 185, called the adjustment act, provides that “ in any case wherein it shall appear that on any contract made or liability incurred on or after the 1st day of January 1862 and before the 10th day of January 1865, the debtor on or after the maturity of the ■claim against him, and within the peroid above mentioned, made to the creditor a bona fide and actual tender of the amount due, in the said Confederate States treasury notes, or other equal or better currency, and that the creditor then refused to accept the same, a court of ■equity may grant relief to the debtor, unless it appear that the creditor was justified in refusing to accept the amount tendered, on account of a substantial and decided depreciation of said currency after the time at which payment ought to have been made, and before the time at which the tender was made.” The debtor in this case, having made the tender on the day of the ,matu *784 rity of the note, his case does not fall within this excepHo is entitled to relief, “unless (as is further Prov^e^) ^ otherwise appear to be inequitable to grant such relief.” This section invests a court of equity with p]enary jurisdiction to inquire what was the contract ; whether the currency tendered was in compliance with it, and whether the creditor was justified in refusing it, and to give the debtor such relief as, under all the circumstances of the case, would be equitable. It involves an inquiry into the whole transaction, with an express inhibition to grant the debtor any relief which would be “inequitable.” This brings us to the inquiry, what was the contract between these parties ?
The appellee, in his answer, assumes that the negotiable notes, the deed of conveyance and the deed of trust furnish the only legal evidence of the contract, and that they must be interpreted according to the principles of the common law and the statutes of Virginia, and the acts of Congress, which were in existence and in force at the time the contract was made. If that position is tenable, it is very clear that it must be construed to be a specie contract. But that position cannot be maintained. Section 1 of the act of Assembly supra provides that either party may rely upon parol, or other relevant evidence, to show what was the true understanding and agreement of the parties, expressed or to be implied, as to the kind of currency with which the contract was solvable, or with reference to which, as a standard of value, it was entered into. And the whole current of decisions by this court is to the effect that the design and operation of the act being to ascertain and enforce what was really, and in truth, the contract between the parties, and not to impair the obligation of the contract, it is constitutional and valid. So that this is a res adjudicate, and no longer an open question.
Again, it is argued by the learned counsel for the appellant that, inasmuch as the act of Assembly reversing *785 the common law presumption was not passed until subsequent to this transaction, and did not go into efieet until the 20th of October 1863, the common law prer sumption that a contract to pay so many dollars is a contract to pay specie, prevailed at the date of this contract and must govern the case. It is true that the appellant cannot derive any benefit from the act of 1863, it being subsequent to the transaction, and only prospective in its operation. By force of that act all contracts made on the 20th of October 1863, and subsequently, for payment of money, shall be presumed to be for currency, unless there is an express intendment to the contrary. So that the efieet of that act was to create a presumption of law just the reverse of the common law presumption.
But the appellant does not rely upon that statute; nor does he rely upon a presumption of law in support of his pretension. But he relies upon a presumption of fact, that the sale was not made to him for specie, but was made for the prevailing currency. This he is authorized to do, not by the act of 1863, but by the act of 1866, which, we have seen, changes the rules of evidence in relation to contracts made between the 1st of January 1862, and the 10th of April 1865, in order to ascertain and enforce the true understanding and agreement of the parties in respect to the kind of currency in which they were solvable. And there can be no question now as to its constitutionality. To say that it was not competent for either party to show by parol, or other relevant evidence, direct or by implication, that the understanding and intention of the parties were really, aud in fact, the reverse of the common law presumption, would be to annul the law, for it would defeat its very end and scope.
The note in controversy, as we have seen, was given for the last instalment of the purchase money, and bears date February 5th, 1862. If it had been given a month *786 and a few days earlier, it would not have fallen within ■the provisions of this act. It was given at a time when Confederate money was comparatively but little depreciated, and when it constituted, together with Virginia State treasury notes and Richmond city notes, all of a uniform value, the circulating medium of the city.
The vendors were not present at the sale. And the auctioneer and all the witnesses who testify on that subject, except one (Moses L. Strau3, a witness for plaintiff), say that nothing was said by the auctioneer at the sale as to the kind of currency in which payment would be required. Straus says that the auctioneer said the cash payment would be received in Confederate money, but he agrees with all the rest, that nothing was said as to the deferred payments. And the auctioneer says that he received no instructions from the vendors as to the kind of currency which would be required.
But that there was an impression on the minds of the bidders and bystanders at the sale that payment would not be required in specie, I think, is shown by all the testimony in the record on that subject, and also by the price bid for the property, and that they expected payment to be made in the prevailing currency. Though if Straus is not mistaken, it would have been implied that no assurance was intended to be given as to the deferred payments. But whilst the above impression prevailed, it is evident that neither the vendors nor the auctioneer said or did anything to create such an impression.
The appellee states, in his answer, that he and his joint vendor sold on time as to part of the purchase money, with the expectation that before the deferred payments were due the confederation would be established and a firm and permanent currency provided, in which they would receive payment. And that they would have been unwilling to have sold entirely for cash. From this the inference is unavoidable that they *787 did not intend the sale to be for specie. And they must have known, from the. price bid for the property, that the purchaser did not regard it as a sale for specie. And the confirmation of the sale, under these circumstances, by the vendors, forbids that they should after-wards be allowed to claim it to have been a specie contract.
"Whilst it was well understood by both parties that the sale was not for specie, there was no clear or definite understanding as to the character of the currency in which the deferred payments should be made—at least, no such understanding as would amount to a binding contract on the part of the vendors to receive payment of the last note at its maturity in an almost worthless paper, though it might retain the impress of a Confederate currency. They had the right, if they chose, to receive payment in a depreciated currency. And they did receive the first and second deferred payments in a greatly depreciated currency, especially the latter. And having accepted it, the purchaser’s obligations, to that extent, were discharged. By the proviso to section 2 of the act of adjustment, supra, he is entitled to have “full credit for the nominal amount so paid, and such payment shall not be reduced.” And I apprehend it cannot be reduced by requiring him to pay a larger amount in discharge of the last payment, in consideration that the vendors had accepted the discharge of the antecedent instalments in a very depreciated currency.
The evidence does not show that it was the true understanding and agreement of the parties that payment should be made in any particular distinctive currency. But it does show, I think, that it was not made with reference to specie as the standard of value, but to the currency which prevailed, State and Confederate, which, being of equal value, were indifferently the standard of value in this contract. There is nothing in the record to show that it was the understanding and agreement of *788 the parties, either express or by implication, or in effect,, that purchaser should have the right to pay, and the should be bound to receive, in discharge of the deferred instalments, or either of them, Confederate currency; however worthless it might become.
I am, therefore, of opinion that Eichard Whitfield was justified in refusing to accept the Confederate treasury notes which were tendered in discharge of the last note at its maturity, when forty dollars thereof were worth only one dollar in gold. And that it would be very inequitable to allow the appellant to discharge his obligation now and to relieve the property from the incumbrance by the payment of the gold value of the money so tendered.
But it would not comport with his contract to require him to pay the face of his note in specie, or in a currency nearly equal to specie. It seems to me that the most equitable and just solution is, to estimate the fair-value of the lots at the date of the contract in gold, and to require the purchaser to pay one-fourth of that sum, with interest, according to the terms of the sale, the last note being for one-fourth of the purchase money, as is provided by the second section of the act of adjustment, as amended by the act of February 28, 1867. And a majority of the court being of opinion that the sum decreed to be paid by the court below, in the present currency, is about one-fourth of the value of the lots at the date of the sale, and is as much as the appellee is entitled to receive, his cross appeal must be dismissed with costs. And the decree of the Circuit court is-affirmed.
Moncure, P. concurred in the opinion of Anderson, J.
Christian and Staples, Js. concurred in affirming the decree.
Decree arrirmed.