Anderson, J.
The appellant Stearns, in October 1862, sold and conveyed to the appellee, Mason, two parcels of land near the city of Richmond, upon which was situated an extensive and very valuable distillery. The price was sixty thousand dollars; of which thirty-five thousand was paid in cash, in Confederate currency. For the balance, the appellee executed two bonds, payable in one and two years, with a deed of trust upon the property as security. The present controversy is as to the measure of the appellee’s liability upon these bonds. And that depends upon what wras the true understanding and agreement of the parties in respect to the kind of currency in which the contract ivas to be fulfilled or performed, or with reference to which, as a standard of value, it was made or entered into.
The court is of opinion that, upon the facts shown by the record, the contract in this case was made with reference to Confederate currency, at its date, as the standard of value. But it does not follow necessarily that the deferred instalments were solvable in that currency. In Myers v. Whitfield, 22 Gratt., 780, the contract was made-with reference to Confederate currency as the standard *487 of value; but the court held that the deferred instalments were not solvable in that kind of currency, and that a tender of it in payment at the maturity of the bond, when it had become greatly depreciated, was not good; and that the obligee had a right to refuse it. It is true that, in the absence of any evidence to rebut it, the presumption would he that it was solvable in the same currency with reference to which as a standard of value it was entered into. But in this case that presumption is repelled. The appellant was not willing to bind himself to receive Confederate currency in payment of the bonds;- and the appellee did not insist on it.
The plaintiff’s allegations in his bills, original and amended, are to the contrary. But those allegations, in all their different shapes and phases, whether inferential or positive, by direct averment or by inuendo, are positively and responsively denied by the defendent in his answer. He denies the allegation “that the parties intended that the bonds should be payable in such currency as was used, circulated, and current as money in Virginia at the time when the bonds should respectively fall due. lie denies that he understood and expected that the bonds would bo paid as they became due in such kind of money-as should then be the common currency in Richmond and its neighborhood.” He also “ denies the allegation that the agreement was, that the credit instalments should be paid in Confederate States treasury notes, if they continued to be the common currency in Virginia at the times the bonds respectively fell due, and if not, then in whatever else should be the common currency at those periods.” And that his answer is, and was intended to be, a denial of the allegations of the bills, not only in their letter, but also in substance, is shown by his repeating his previous averment, that at the time of sale he refused to receive a cent more in Con *488 federate treasury notes; and “that the credit payments were to be in such money as the law of Virginia authorized in payment of debts.”
USTo direct evidence is adduced by the plaintiff in support of the allegations of his bills, thus positively and responsively denied by the answer, except his own testimony, and that falls short of proving the agreement as alleged. If it were fully up to the mark, if he had fully testified to what is alleged in his bills, and it were held that the testimony of the plaintiff himself meets the requisition of the principle of courts of equity, which requires two credible witnesses or one witness and corroborating circumstances to overthrow the answer, (a question which it is unnecessary to decide now,) we think the circumstances do not corroborate, but rather repel the aforesaid allegations.
I think these facts are established by' the record: First, that the appellant refused to receive any more than §35,000 in Confederate currency at the time of the sale, though the appellee desired and proposed to pay more. And second, that it was the confident belief of the appellant that Confederate States treasury notes would continue to depreciate. These facts are admitted by the appellee in his testimony. It iá also proved by other witnesses that it wras the confirmed belief and conviction of the appellant, at that time, that said currency never would be redeemed, and therefore would become worthless. The inference from these facts is irresistible. If he wms not willing to receive more of it at the date of the contract, it is not probable that he would have hound himself to receive it at maturity. And if he refused, for the reason the appellee says he assigned, that he could not use it immediately, the case is stronger; for it show’s that he was not willing to take it to keep, even until he could meet with an opportunity of investment and run *489 the risk of its further depreciation, if this be so, it is hardly possible that he would be willing to bind himself to receive it in payment of the deferred instalments, not maturing for the period of twelve months and two years. In having the bonds, the deed of conveyance and the deed of trust prepared, to complete the contract, the bill alleges that he made no provision for payment in currency. Why would he have had them so prepared, if he had agreed or intended to contract for their payment in Confederate currency? The plaintiff avers that he objected to execute the bonds in that form, lest he might be bound to pay in specie, and proiiosed to appellant to insert the words “in current money of Virginia;” to which he acceded, and had the bonds so drawn; and they were then executed by the appellee.
Why did the appellant accede to this proposition? Because their insertion, in his opinion, would not materially change the legal effect of the bond, and therefore it was, it may be presumed, he accepted it. He says in his answer, “ This respondent had positively refused to receive another cent of treasury notes, and in consenting to accept bonds payable in ‘current money of Virginia,’ he meant to receive what these bonds legally import, namely: such money as is authorized by the laws of Virginia to be paid in discharge of debts or liabilities.” “Current money of Virginia” may import a currency made money by the laws of Virginia, just as current money of the Confederacy imports a currency created by the government of the Confederacy. They were distinguishable; and a citizen of Virgiuia, at the date of this contract, may well be supposed to have had more confidence in the former than the latter, especially if he were not very hopeful of a favorable result of the war. If that proved disastrous the Confederacy must be inevitably overthrown, and -its curi’ency must perish with it. *490 But the States having an antecedent existence, and being' indestructible, it was a reasonable conclusion that a currency created by their governments would survive the wreck of the Confederacy, and such we believe was the opinion of many. The meaning of the terms “ current money of Virginia” may be controlled by the connection, in which they are used. When used in contradistinction to Confederate currency as well as specie, as I think they were in this instance, their import is such as I have indicated. And in that sense the appellant seems to have understood them.
I do not think that he understood or intended their insertion to give to the bonds the effect of specie obligations. And he expressly disclaims in his answer an intention to demand specie. It is true that the State of Virginia could not legislate that any currency, except gold and silver coin, should be received in payment of" debts and liabilities. The appellant seems not to have been aware of this constitutional inhibition. He seems-to have believed, which is perhaps a general popular error, that it was competent for a State to make bank notes, or other paper currency, receivable in payment of debts and liabilities. I think it is evident that lie did not understand the words to import specie. He must have supposed that the appellee understood that the change he proposed would exclude the idea of an obligation to pay specie.
It is equally evident, I think, that he did not understand the words to mean Confederate currency; or that the appellee so understood them. When he accepted the proposition of the appellee, to insert those words in the bonds, he would of course have understood them to mean something different from Confederate currency; which the appellee knew he was not willing to receive beyond $35,000, because he had.no immediate use for it, *491 aud was not willing to receive any amount of it, to keep on hand, on account of its rapid depreciation and his total want of confidence in its ultimate redeemability; and consequently would not bind himself to receive it in payment of the deferred instalments, a year or two years hence. He had no reason to believe, then, that the words pi’oposed to be inserted were intended to include that currency; and ho may well have understood them to mean Virginia bank notes, or other currency which Virginia might make receivable iu payment of debts or liabilities. And if the appellee knew that the words were so understood by him, then, upon reason and authority, such would have been the agreement. 2 Coldwell R., 591 (citing Chitty on Cont., p. 62), the court says: “ One party is bound, as well by the rule of moral right as by law, to keep or perform his contract with another, in the sense in which he knew at the time of entering into it the other understood the contract.” But such a stipulation would be void, because of the impossibility of its performance — the incompetency of the State to create such a currency. And the stipulation as to the kind of currency in which the contract was solvable would be Amid; and the contract would stand just as if there had been no stipulation on that subject, except that any presumption that it was solvable in Confederate currency, arising from the fact that the contract Avas made with reference to that currency as the standard of value, would be repelled by the facts; which, though they do not evidence a Aralid contract, yet show that the parties did not intend to make a contract solvable in Confederate currency, as they provided for its performance, though ineffectually, in a different medium. It is evident, I think, that the appellant did not understand the change made in the bonds as binding him to receive payment in Con *492 federate currency, nor as giving them the effect of specie obligations.
How did the appellee understand it? His objection to executing the bonds as first drawn, lest they might bind him to pay specie, conclusively show's that he did not intend the insertion of the words which he proposed to give them the effect of specie obligations. And it is almost equally certain that he did not intend his proposition to be understood by the appellant as binding him to receive payment in Confederate treasury notes in the event that they continued to be the currency at the maturity of the bonds. If such had been his intention there is no reason why he did not propose to insert “ Confederate currency,” or the currency in common use at the maturity of the bonds, w'hieh w'ould include Confederate currency. If such had been his proposition I think there can hardly be a doubt that the appellant would have instantly rejected it. The circumstances tend strongly to show that the appellee was aware of it, and therefore did not propose it.
It is easier to understand what the parties did not mean by the words inserted, than to ascertain what they did mean. The words themselves are equivocal, and men might honestly differ as to their construction. The appellant and the appellee seem to have differed widely as to what they respectively understood them to mean. And whatever may be their legal effect, if the appellee, at the time of executing the bonds, understood them to mean one thing and the appellant another, and neither knew how they were understood by the other, there was really no agreement between them as to the medium of payment. Consequently, there wras no obligation on the appellant to receive payment in a greatly depreciated currency of the Confederate States at the time the tenders *493 were made. It was a Confederate contract with reference to the standard of value at the time it was entered into; but there being no contract, exjiress or implied, that the deferred instalments should be payable in Confederate States treasury notes, the appellant was not bound to receive them, so greatly depreciated as they were, when tendered in discharge of the appellee’s obligations. But the contract having been made with reference to Confederate States treasury notes as the standard of value, it must be scaled as of the date of the contract.
This is our conclusion from the facts and law of this case. That conclusion is the result of mature deliberation, and the best consideration w7e could give to it, with the assistance of able arguments on both sides, and we think it is not unjust to the appellee. He got a valuable property from the appellant, which they estimated to be worth, in the currency in general circulation at the time, sixty thousand dollars, and I think the evidence shows that it was not a hard bargain. He paid $35,000 down in Confederate currency, and on the 24th day of October 1864 tendered twenty-eight thousand dollars as a full payment of the balance, which the appellant refused to receive. According to the evidence in the record it was worth only $1,054.33 at the time of the tender, whilst, according to the contract, the balance of purchase money unpaid was worth in gold, at the date of the contract, ten thousand dollars, upon the one-half of which the appellant was entitled to one year’s interest, and two year’s interest on the other moiety. The money tendered was lost. "We think the law throws that loss upon the appellee; and it is not so great a hardship on him to lose the value of that tender as it would be upon the appellant to lose his $10,000— a result which we think would have been flagrantly unjust to him, as we are clearly of opinion that the fevidence *494 docs not show that either party intended a contract of hazard, depending upon the kind of currency in common use at the maturity of the bonds.
Upon the only remaining point, the question of interest, the majority of the court are of opinion that it would be inequitable, under the circumstances of this case, to require the appellee to pay interest; and this mainly upon the ground of the uncertainty and doubt as to the amount ho was owing, and whether he was owing anything. It was a question of doubt whether the tender and refusal of Confederate treasury notes to the full amount of the debt was not a discharge of his obligation. But if the obligation was not discharged, it was a question of great doubt and uncertainty what amount the appellee was owing, and could not be ascertained until determined by the court. Although bonds were executed for specified sums, the amount due upon them was as uncertain and unliquidated as an open account, or as the amount of damage before verdict for a tort. This court has repeatedly held that when accounts were unliquidated and disputed between the parties, interest ought not to be allowed. Kerr & Co. v. Love, 1 Wash., 172; McConico v. Curzen, 2 Call, 358. In Skipwith v. Clinch, 2 Call, 253, interest upon rent was refused where the .amount was so uncertain that the lessors did not venture to distrain. Where an attorney-at-law had lost debts by negligence he was charged with the principal of the debts, but not with interest. Rootes v. Stone, 2 Leigh 650. A claim was presented to the Auditor, which was refused; upon an appeal to the court it was allowed. Although the claim was just it was doubtful; and it was held that in such case the court ought not to allow interest. Auditor v. Dugger, 3 Leigh 241. These cases show that the court ought not to allow interest when the claim, though *495 just, is doubtful, or where the amount is unliquidated and uncertain.
Although a majority of the court holds in this case that the appellant was not bound by his contract to receive payment of the deferred instalments in Confederate currency, which had become greatly depreciated, yet it was a question of so much doubt that judges have differed, and this court is not unanimous after able and exhaustive argument ; and therefore the parties may well have differed, honestly differed. Of one thing there seemed to be no doubt, that the appellee was not bound to pay in specie ; and he promptly tendered payment of the whole amount of debt, principal and interest, which had accrued upon it, in Confederate currency. He could make payment in nothing else; there was no other currency. 'When refused, he kept it on special deposit in bank, to meet his obligations, until the caqiture of Richmond by the enemy, near the close of the war, when it perished in the general conflagration. He did all he could do to pay the debt at maturity. It was not his fault that there was no better currency. By his efforts to fulfill his contract, he has lost the whole nominal amouut of the debt in such currency as we had. It was doubtful, as we have seen, whether he had not fulfilled it, and if he had not (as we have determined) it was uncertain and doubtful -what amount he had to pay to that end; so uncertain that it could only be known by the final determination of the court. lie has had no use of the property in the meantime by reason of its destruction by fire before the maturity of the bonds; which it is true could not affect the question of contract, as the property was at his risk. But if he had the use and derived a profit from the property, it would have had au important bearing upon the question of interest. It is therefore the opinion of the majority of the court *496 that under all the circumstances of this case, which is a suit in equity, the appellant is entitled to a decree for ten thousand dollars in gold, or its equivalent, in legal-tender notes at the time of payment, the value of' the unpaid balance of purchase money at the date of the sale, with interest thereon from the date of the decree of the Circuit court until payment. ' Let the decree be reversed at the appellee’3 costs, and the cause remanded to the circuit court of Henrico for further proceedings to be had therein in conformity with this opinion.
Moncure P. and Christian J. concurred in the opinion of Anderson J. on the first point, but dissented on the second.
Staples J. concurred in the results of the opinion of Anderson J.
Bouldin J. dissented on the first point, and concurred in the decree that interest should not be charged.
Decree reversed.