# 𝔠𝔥𝔞𝔯𝔩𝔢𝔰𝔱𝔬𝔫.

## BIERNE v. BROWN'S ADM'R et al.

Decided May 3, 1877.

1877.
January Term. 1. A sale of property, for cash, was made in Monroe county, with reference to confederate states treasury notes as a standard of value, on December 26, 1862. The balance of the purchase money not actually paid must be reduced to its true gold value as of that date; but in ascertaining this value, the price at which gold was then selling in confederate currency—in Richmond or elsewhere in the confederate states—is not to be regarded as fixing the relative value of gold and confederate notes. The value of confederate notes then, as compared with gold, should be ascertained by the then average apparent appreciation in value, when sold for confederate currency, of all kinds of property, real and personal, in Monroe county, as compared with the value of such property just before the war commenced, when gold was the currency of the country.

2. In enforcing a vendor's lien against the estate of the vendee, after his death, the court ought to require the personal estate in the hands of the administrator to be first ascertained, and how much of it is applicable to the payment of the purchase money due, and should require it to be so applied before it decrees a sale of the land to pay the lien.

Appeal from, and *supersedeas* to, a decree of the circuit court of Monroe county, pronounced at its May term, 1874, in a chancery suit therein then pending, in which Oliver Bierne, was plaintiff, and Edwin M. Brown's administrator *et al.*, were defendants.

The appeal was granted upon the petition of said Bierne.

· Hon. Homer A. Holt, Judge of the eighth judicial circuit, presided at the hearing below.

GREEN, PRESIDENT, who delivered the opinion of the Court, gives a full statement of the case.

*W. W. Gordon* and *James F. Patton*, for appellant, referred to the following authorities:

*Thorington v. Smith,* 8 Wall., 1; 1 Green. Ev., §200; *Bell v. Alexander,* 21 Gratt., 1; *White v. Atkinson,* 2 Wash., 94; *Dearing v. Rucker,* 18 Gratt., 426; *Lohman v. Crouch,* 19 Gratt., 331; *Omohundra's ex'or v. Crump,* 18 Gratt., 703; *Bierne v. Dunlap,* 8 Leigh, 514; *Butcher v. Carlisle,* 12 Gratt., 520; *Pharis v. Dice,* 21 Gratt., 301; *Carter v. Ragland,* 21 Gratt., 574; *Meredith v. Salmon,* 21 Gratt., 762; *Moses v. Price,* 21 Gratt., 566; *Poague v. Greenlee's adm'r et al.,* 22 Gratt., 724; *Saunders v. Branaman,* 22 Gratt., 807; *Merriweather v. Dowdy,* 25 Gratt., 232; *Bently v. Harris' adm'r,* 2 Gratt., 357; Adams' Eq., §270, 272.

*J. W. Harris* and *Samuel Price,* for appellees, referred to the following authorities :

*Walker v. Page,* 21 Gratt., 636; *Lohman v. Crouch,* 19 Gratt., 331; *Walker v. Pierce,* 21 Gratt., 722; *Effinger v. Kinney,* 24 Gratt., 121; *Brightwell v. Hoover,* — Gratt., —; *Enders v. Board of Public Works et al.,* 1 Gratt., 363; *Merwether v. Dowdy,* 25 Gratt., 232; *Omohundra v. Crump,* 18 Gratt., 703; *Dearing v. Rucker,* 18 Gratt., 426; *Robinson v. Noble,* 8 Pet., 181; *Bierne v. Dunlap,* 8 Leigh, 514; *Butcher v. Carlisle,* 12 Gratt., 520; *Myers v. Whitefield,* 22 Gratt., 780; *Stearns v. Mason,* 24 Gratt., 484; *Kemper v. Ewing,* 25 Gratt., 428; *Magill v. Manson,* 20 Gratt., 527; 2 Rob. Pr., 823; 1 Tuck. Com., 419; Acts 1873, of Dec. 26, §8; Code W. Va., 506; Acts 1873, p. 371; 2 Wms. Ex., 1531; 2 Lomax Ex., 405, 408, 411; 2 Wms. Ex., 5 ed., 1526; 1 Story Eq., §571; *Elliott v. Carter,* 9 Gratt., 549.

GREEN, PRESIDENT, delivered the opinion of the Court.

Oliver Beirne, on the 31st of March, 1870, instituted

1877.
January Term.

Bierne
v.
Brown's adm'r
et al.

a chancery suit in the circuit court of Monroe county, to enforce the specific performance of a contract in writing, dated December 26, 1862, made by E. M. Brown with him, for the purchase of a tract of land of six hundred and fourteen acres, in Monroe county, which, in accordance with the contract, he had put said vendee in possession of shortly after said sale, and upon which Brown had paid only $5,000.00. By this contract said Brown had agreed to pay $25.00 per acre, for said land in cash, or deferred payments with interest from date, as might be agreed upon. The bill states that Brown had sold various portions of this land to sub-purchasers who and whose representatives were made with said Brown defendants; by this contract the vendor was to make a deed to the vendee of the land when the entire purchase money was paid. The bill prays that the complainant may have a decree for the unpaid balance of the purchase money; that the said tract of land may be subjected to sale to pay the complainant's vendor's lien on said land and for general relief. The answer of Brown states that the tract of land was to be paid for in treasury notes of the confederate states, for though not so expressed on the face of the contract, yet the contract was made in the reference to said notes, that the county of Monroe was in the possession of and under the military control of the confederate government, and that $25.00 per acre for this land meant $25.00 confederate money, and that was the agreement between the parties, confederate notes being the sole currency of the county at the time, that when the purchase money became due he tendered it to Bierne in confederate notes, which he declined to take because they were depreciated and asked him to invest them in confederate bonds, and he did invest $2,000.00 of them in confederate bonds which Bierne declined to take; that he afterwards made another tender of payment in full for said land in confederate notes which Bierne declined. That he kept these confederate notes on hand and has always been ready and willing to comply with his contract, and

1877.
January Term.

Bierne
v.
Brown's adm'r
et al.

that the loss arising from the said confederate notes becoming worthless, must fall upon the vendor. Some of the sub-vendors in their answers insist that this was an illegal contract which a court of equity ought not to enforce. Bierne filed a replication in which he denies that said sale was made in reference to confederate currency as a standard of value, that though he had received this $5,000.00 payment in confederate notes, that he had done so, because he choose so to do, and not because he was bound so to do by the terms of his contract either expressed or implied, and that it never entered into his conception or into the conception of his vendee, that he was so bound. He denied also that any tender was ever made to him or that any investment was made by Brown for him of $2,000.00 of confederate notes in confederate bonds, or that they were offered to him or that he ever heard of them.

Numerous depositions were taken. There was no effort even to prove any tender in confederate notes, or otherwise, of the purchase money, or of any investment having been made by Brown for Bierne in confederate bonds, and effort was made to prove by two witnesses that Bierne shortly after the contract, had said that he sold the land for confederate money to Brown. One of the witnesses states that he heard Bierne tell Caperton so upon the day of the sale. But Caperton, who ought to have had a better recollection of such a conversation with him, than one who heard it, expressly denies that such statement was made to him by Bierne, who also denies making such statement. Another witness says that in the fall of 1863, or 1864, Bierne made the same statement to him. But Bierne positively denies this in his deposition, and Brown's evidence was not taken. I think that as the contract would naturally have stated that the money was to be paid in confederate notes, if that had been the express understanding, it is reasonable to infer upon the above evidence that there was no such express understanding. There were many witnesses

who deposed to the value of the land. The decided weight of the testimony, is that the land was not worth as much as $25 per acre at the time it was sold in specie, and Bierne himself states that he would have taken less than $25 per acre in specie. Though no direct testimony was taken to prove what was the currency circulating in Monroe county at the time of the sale, yet it is fair to infer from it that confederate notes was then the general currency. Beirne himself proves that he received at that time confederate notes for a quantity of land sold to other parties. It is in proof that confederate notes were then considerably depreciated as compared with gold, though the depreciation was less in Monroe county than in Richmond, but how much less does not appear, there being very little gold in Monroe county, and very little of even what was there ever being offered for sale. A single sale of $10.00 only, of gold is proven, and the price of it is not shown. I think that it is reasonable to conclude that on this evidence that this sale, while not made payable in confederate notes, was made with reference to confederate notes, as a standard of value. There was no evidence that the parties ever agreed upon any credit for the purchase money of this land, the contract being, that $25.00 per acre should be paid in cash or deferred payments, with interest from date, as might be agreed upon. On October 20, 1873, the cause coming on to be heard, the circuit court expressing the opinion that this sale was made in reference to confederate notes as a standard of value, ordered that a commissioner of the court should state and report an account ascertaining the balance due upon the contract between said Bierne and Brown, for said land, and also the cash value in gold of said balance, assuming the same to have been dischargable in confederate notes, at the date of the purchase, December 26, 1862, in the county where the contract was made and land was situated; and also, to ascertain what gold value, if any, the parties affixed to the land at the time of the contract, or to said confeder-

ate notes. And also, what balance was due from the

sub-purchasers, and the cash value thereof if payable in confederate notes, and in whose hands the lands were, the quantities held by each, and the date of their purchases. The commissioner took only the proof of the value of confederate notes in gold. It was proven that the following table sets forth correctly the price of $1.00 in gold in confederate notes, at the different dates named in the city of Richmond, on sales there made, of gold :

| | 1861. | 1862. | 1863. | 1864. | 1865. |
|---|---|---|---|---|---|
| January ..... | $...... | $1 25 | $ 3 00 | $20 00@20 50 | $45 00@60 00 |
| February ... | ...... | 1 25 | 4 00 | 20 50@23 00 | 45 00@65 00 |
| March........ | ...... | 1 30 | 5 00 | 23 00@24 50 | 70 00@60 00 |
| April......... | ...... | 1 40 | 5 00 | 22 00@23 00 | 60 00 |
| May.......... | 1 10 | 1 50 | 5 50 | 18 00@21 00 | ........ ........ |
| June ........ | 1 10 | 1 50 | 7 00@ 8 00 | 17 00@19 00 | |
| July ......... | 1 10 | 1 50 | 9 00 | 20 23@23 00 | |
| August ...... | 1 10 | 1 50 | 12 00@13 00 | 22 50@20 00 | |
| September.. | 1 10 | 2 50 | 12 00@13 00 | 22 50@27 50 | |
| October ...... | 1 15 | 2 50 | 14 00 | 26 00@27 00 | ........ ...:.... |
| November .. | 1 15 | 3 00 | 15 00 | 27 00@33 50 | |
| December... | 1 20 | 3 00 | 18 00 | 34 00@49 00 | |

The commissioner reported that the balance of the purchase money due to Bierne, on May 11, 1874, was $17,441.56, and that the cash value of this balance in gold was $6,395.23. This was ascertained by taking the above table as showing the relative values of confederate treasury notes and gold correctly, the value of a gold dollar being held to be worth, on December 20, 1862, the date of the contracts, $2.72 8-11. At plaintiff's instance, he reports that, assuming that the value of the land, at the time of the sale, was $22.50 in gold, which the commissioner thinks the evidence shows it was worth, the balance due to Bierne would be, on May 11, 1874, $14,873.52. He also reported that no evidence was offered to show the gold value, if any, the parties affixed to the land at the time of the contract, and none as to the value the parties affixed to confederate notes at said time, except that the plaintiff, in his deposition, stated that he would have sold the land for

less money in 1862, for specie, and that he then had as much confidence in confederate notes as in greenbacks. He also reports the quantity of land held by each sub-purchaser, and the amount due from him. The commissioner's report was excepted to by the plaintiff's counsel, because the evidence in the cause shows that confederate money was more valuable, as compared with gold, in the county in which the contract was made, than in the city of Richmond, and the commissioner takes its value in Richmond in applying the scale, and because the evidence showed that its value, as compared with other property, was greater than as compared with gold. And he also excepted to said report, because it is based upon the value of confederate money, as compared with gold, when the true basis upon which to ascertain the value of confederate money is the value of the subject matter of the contract. And lastly, he excepted to the last statement of the commissioner, because he put too small a value upon the land.

Edwin M. Brown having died pending the suit, and the cause having been revived against his personal representative and heirs, the court, on May 15, 1874, over-ruled all the exceptions to the commissioner's report and ordered that his first statement be confirmed, and also the account of the amount due from the sub-purchasers. And it thereby appearing that there was a balance due to the plaintiff of $6,395.23, as of the 11th of May, 1874; and that there was due from the estate of the sub-purchaser, Mitchell, applicable to the payment of the debt, $4,009.96; and from the estate of the sub-purchaser, Hull, $1,047.12; and from the sub-purchaser, Vass, $539.00, all as of the last named date, which sums should be first applied to the payment of the plaintiff's debt before the land in the hands of the other sub-purchasers should be sold, upon which the plaintiff also holds a lien. But before this lien should be enforced, an account should be taken to ascertain whether there is personal assets in the hands of Brown's personal representative, sufficient to pay the

1877
January Term.

Bierne
v.
Brown's adm'r
et al.

plaintiff's debt, the personal fund being the natural fund for the payment of debts, which must be first exhausted before the lands could be reached by creditors. The court, therefore, ordered a reference of the cause to a commissioner, to settle the account of Brown's admistrator, summoning all the creditors of Brown, and ordered the commissioner to report the debts and liabilities of the estate, and to show what estate, if any, remains in the hands of said administrator. To this decree an appeal and *supersedeas* was awarded on the petition of Oliver Bierne, assigning as errors: 1st, that the court erred in holding that this contract was a confederate contract. 2d. If it was a confederate contract, it was error to scale the nominal amount of the purchase money to its gold value, to ascertain the value of confederate notes. As land and not gold was the subject matter of contract. 3d. That the value of the land should be the measure of recovery, and lastly, that it was error in the court to require a settlement of Brown's personal estate in the hands of his personal representative before decreeing the land to be sold. The last assignment of error is not well taken. The general rule is that the personal estate in the hands of the administrator is the primary and natural fund, which must be resorted to in the first instance for the payment of debts contracted by the intestate. *Laidley v. Klines' adm'x*, 8 W. Va., 218. And though a debt so contracted be a lien on particular real estate by a mortgage, or a vendor's lien, this general rule would still be applicable, because the debt was originally a personal obligation on the intestate and the lien on the particular real estate should be regarded merely as a collateral security; but if the mortgage or vendor's lien be binding on a party's land who did not originally contract the debt as a sub-purchaser who has died, then, though this sub-purchaser had in his lifetime covenanted with the original owner of the land, to pay the debt, then the particular real estate specifically charged would be responsible before the personal estate of the sub-purchaser in the hands

of his administrator; for in such case the sub-purchaser's covenant to pay the debt should be regarded only as collateral security for the debt. See 1 Story's Eq. Jurisprudence, pp. 539, 540 and 541 and cases cited.

The other errors assigned, involve the question, what is the correct interpretation of " the act providing for the adjustment of certain liabilities arising under contracts made between the 1st day of May, 1861, and the 1st day of May, 1865," passed April 7, 1873. This act has never been construed by this Court. The case of *Jarret v. Nickell, et al.,* 9 W. Va., p. 345, being decided on mon law principles, the particular contract in that case not being affected by this act. This act, so far as it has any bearing on this case, is in these words.

" 1. That in any action, or suit, or other proceeding for the enforcement of any contract, expressed or implied, where such contract was for the sale or purchase of any real or personal property, made or entered into between the 1st day of May, 1861, and the 1st day of May, 1865, it shall be lawful for either party to show by parol or relevant testimony, what was the true understanding and agreement of the parties thereto, either expressed or to be implied, in respect to the kind of currency in which the same was to be fulfilled, or performed, or with reference to which, as a standard of value, it was made or entered into; and in any action at law, or suit in equity, it shall be necessary to plead the agreement specially, in order to admit such evidence.

" 2. Whenever it shall appear that such contract was according to the true understanding and agreement of the parties, to be fulfilled or performed in confederate state treasury notes, or Virginia treasury notes, or was entered into with reference to such notes as a standard of value, the same shall be liquidated and settled by reducing the nominal amount due and payable under such contract in confederate states treasury notes, or Virginia treasury notes, to its true value at the time they were

respectively made and entered into, or at such other time
as may to the court, or, if it be a jury case, to the jury
seem right in the particular case. And upon the pay-
ment of the value as ascertained, the party bound by
such contract shall be forever discharged of, and from the
same : Provided, that in all cases where actual payment
has been made of any sum of such confederate states
treasury notes, or Virginia treasury notes, either in full,
or in part, of the amount payable under contract, the
party by, or for whom the same was paid, shall have full
credit for the nominal amount as paid, and such payment
shall not be reduced." See acts of 1872, 1873, ch. 116,
p. 307, 308.

A comparison of our act with that of the Virginia
Legislature of March 3, 1866 (see Code of Virginia of
1873, ch. 138, §5 and 6, p. 981-2), will show that our act,
so far as above quoted, is almost identical with this Vir-
ginia act, the only difference being that the Virginia act
applied to all contracts made between the specified dates,
and those dates in that act were the 1st day of January,
1862, and the 10th day of April, 1865. That act also
applied to contracts to be performed in confederate states
treasury notes, or such as were entered into in reference
to confederate states treasury notes as a standard of value,
while ours applies also to contracts of the kind named
in the act, to be performed either in confederate states
treasury notes or Virginia treasury notes, or contracts
of such kind entered into with reference to either of
said kind of notes as a standard of value. The agree-
ment by the Virginia act need not be pleaded specially
in order to admit parol evidence, but by our act, it must
be pleaded specially to admit such evidence. Our act
has no preamble ; the preamble of the Virginia act will
aid us in construing our act. It is in these words :

" WHEREAS, a depreciated currency, known as confed-
erate treasury notes, constituted the only, or principal,
currency in the greater part of this state during the late
war ; and whereas, the result of said war involved the
total destruction of said currency ; and whereas, there

are many contracts which were made, or obligations
which were incurred, before the termination of said war,
predicated on said depreciated currency, still remaining
wholly or partially unadjusted, in respect to which great
uncertainty exists, perplexing alike to creditor or debtor,
as to the present measure of their liabilities and rights
respectively; and it thus appearing useful that some uni-
form and equitable rule .should be established for the ad-
justment of such mutual demands and liabilities; there-
fore, be it enacted."

At common law, in an obligation to pay " dollars,"
this word would be interpreted to mean " gold dollars,'
if the contract was made in this country ; but if made in
a foreign country, it would mean the dollar of that
country, and parol evidence would be admitted to show
where the contract was made, and the value of the dollar
of the country where the contract was made, as compared
with our gold dollar. If the contract was made in the
confederate states, or where the military authorities of the
confederate government exercised control, and confederate
notes constituted the currency, this fact might be shown,
and the word dollar unexplained in a contract, would
mean a confederate note of one dollar. And the meas-
ure of recovery .would be the value of such confederate
dollar in gold currency, which might be shown by parol
evidence. *Thorington v. Smith*, 8 Wallace, 1 ; *Jarret v.
Nickell, et al.* 9 W. Va., 345. Parol evidence in such case
does not modify the contract, it simply explains a latent
ambiguity, and such ambiguity may, under general rules
of evidence, be removed by parol testimony. Shortly after
the passage of this act in Virginia, the idea prevailed
that its whole effect was to enable an obligee in a con-
tract made during a portion of the war, by parol, or
other relevant testimony, to show that by the word "dol-
lars," was meant " confederate dollars," and not " gold
dollars." And this seems to have been the construction
put upon it at first by a majority of the Judges of the
court of appeals of Virginia, and as a consequence of

this interpretation of this act, they held that the measure of recovery was the value of "confederate dollars" scaled to the value of "gold dollars," as of the time the obligation fell due. See *Deariug v. Rucker,* 18 Gratt., 426. *Lohman v. Crouch,* 19 Gratt., 331. But this construction was never satisfactory to the profession, and these decisions were dissented from by the president of the court, Judge Moncure, who, in an able opinion, delivered in the first of these cases, presented strong reasons for his dissent. The Judges who concurred in these decisions, were Judges Joynes and Rives. The construction thus put upon this act, seems to me unsound. There would seem to have been scarce a necessity to pass this act, if this were its only effect, for we have seen that at common law if the contract was made in the confederate states, parol or other relevant testimony was admissible to show that the word "dollars" in the contract, meant "confederate dollars," and not "gold dollars," and the value of such confederate dollars. The preamble of the Virginia act shows that the Legislature thought that the necessity of passing such an act was very urgent. So construed, this act was almost useless; but properly construed, the act was very important, indeed neccessary, to prevent in many cases the grossest injustice. If the act had only said that "parol or other relevant testimony might be introduced to show the true understanding of the parties *in respect to the kind of currency in which the same was to be fulfilled or performed,"* this construction would have been more reasonable; but this act says more; it also says, "that parol or other relevant testimony might be introduced to show the true understanding of the parties *in respect to the kind of currency in reference to which, as a standard of value, it was made and entered into."* If a contract required the payment of "confederate dollars," or if, by parol proof, it was shown that this was the express understanding of the parties to the contract, this would have been a contract of hazard, and the obligee

would have had to receive, in payment of such an obligation, the number of confederate dollars named in the contract, no matter how depreciated they might have been when they became due under the contract. But if the contract did not require payment in "confederate dollars," and the parol proof did not show that the express understanding of the parties was, that the payment was to be made in confederate dollars, but only showed that the contract was entered into with reference to confederate currency, as the standard of value, then such contract ought not to be regarded as a contract of hazard, and it ought not to be held that payment was to be made in confederate dollars, no matter how much depreciated when the money became payable, as the parties to such contract must have known, what none could fail to observe, that confederate notes were constantly and rapidly depreciating. The fair inference to be drawn from the simple fact that the contract was entered into with reference to confederate notes as a currency, would be, not that the contract was to be fulfilled in confederate notes, calling for the number of dollars named in the contract which the parties knew would be much more depreciated at the day of payment, but rather that the *then value* of the number of dollars required to be paid, estimated as confederate dollars, should be paid, when by the contract they became due, in the currency, whatever it might be, in circulation when it was to be paid. The contract so interpreted would have no sort of reference to the currency in which it was to be fulfilled, but the confederate notes would be regarded simply as the standard of value, which the parties had reference to, whose then value has to be paid at a future time. So understood, a contract made during the war, when and where confederate notes were the sole currency, in the absence of proof, must be regarded as made with reference to confederate notes as a standard of value. But such a contract ought not, in the absence of proof, to be regarded as a contract of hazard, as it would be if it

was to be interpreted that it was to be fulfilled by the payment of the number of dollars called for in so many confederate dollar notes. The more recent and sounder Virginia decisions are, really based on this contruction of this statute, though it is not avowed. See Stearns v. Mason, 24 Gratt., 493; Myers v. Whitefield, 22 Gratt., 780. These latter decisions too, accord with the decision of the court of appeals of Virginia under the act of 1781, which was very similar to this act and passed to remedy the same evils arising during the revolutionary war from the depreciation of the then currency of the state. See Pleasants v. Bibb, 1 Wash., 8 Wils., and McRae v. Keeling, 1 Wash., 194; Ambler v. Wyld, 2 Wash., 36; White v. Atkinson, 2 Wash., 94. And the review of these cases by Judge Moncure, in Dearing's adm'x v. Rucker, 18 Gratt., 465, in which opinion, he gives the substance of the act of 1781. In the case now before this Court, the contract requires the payment of "$25.00 per acre for the land in cash, or in deferred payments with interest from date, as may be agreed upon." And as no proof was introduced that the parties had agreed upon any terms of credit, the circuit court properly regarded the contract as calling for the payment of $25.00 an acre in cash, and that it is unnecessary for this Court to determine in this case when a contract is entered into in reference to confederate notes as a standard of value, and payments are to be made at future times, what is the proper time to be adopted as the time at which the scaling is to be done; yet the views which I have expressed above upon this point are pertinent, as they indicate my view of the spirit in which this act of assembly should be interpreted. It should be regarded as an important and necessary act, designed by the Legislature, as far as they could constitutionally do so, to enable the courts, in enforcing contracts made during the war, to do justice to the parties to the contract by enforcing it according to their true intent and meaning; and in order to arrive at this true intent and meaning, the Legislature, in all

*1877.*
*January Term.*

Bierne
v.
Brown's adm'r
et al.

96

cases to which the act applies, has authorized the courts to disregard the common law rule of evidence, and to permit parol, or other relevant evidence, to be introduced to show the kind of currency with reference to which, as a standard of value, the contract was entered into. And when so ascertained, as I interpret this act, the courts are authorized to reduce the nominal amount due in confederate states notes, to its true value at the time the contract was made or entered into; and upon the payment of such value, the party bound by such contract was to be forever discharged therefrom. The question directly presented by this case, is, how is the nominal amount named in the contract to be reduced to its *true value* as required by the statute? This act is constitutional; the Legislature has a right to modify the rules of evidence so as to enlarge the evidence which may be introduced to ascertain what the contract between the parties actually was. But it being once ascertained, the courts must enforce the contract according to the true understanding of the parties, and a legislative act which required or permitted a contract to be enforced otherwise than according to the true understanding of the parties, would be a violation of the constitution of the United States, forbidding a state from passing any law impairing the obligation of a contract. (See Cons. U. S., Art. 1, §10). But this act requires the contracts to be enforced according to the true understanding of the parties, and simply enlarges the means whereby this true understanding may be established. The appellant insists that the actual value of the land per acre, as estimated by witnesses, shall be regarded as the *true* value of the $25.00 per acre named in the contract. If $30.00 per acre had been named in the contract as the price to be paid the appellant, if consistent, would insist that the actual value of the land, as estimated by witnesses, would be the true value of this $30.00 per acre. The result would be that the court would construe a contract calling for the payment of $25.00 per acre, as meaning precisely the same as a con-

tract calling for $30.00 per acre to be paid. Though both contracts were made at same time and place, this is obviously a simple setting aside of the price per acre fixed by the parties to the contract, and substituting for it the valuation of the land by witnesses. If the act authorized or required this to be done, it would be unconstitutional, as it would impair the obligation of the contract. But as I interpret this act, it neither requires or authorizes this to be done. It requires the *true value* of $25.00 of confederate notes to be found, and then says the contract shall be fulfilled by the payment of this *true value*. But the court has no right to assume that the true value of this $25.00, is what witnesses estimate an acre of the land to be worth. It is true the parties by this contract may have estimated an acre of this land to be worth $25.00 in confederate notes. But they may have placed upon this land a very different value from what the witnesses estimate it as worth, or the vendor may have been willing then to have taken much less than the actual value of the land, or the vendee might have been willing to have given, then, much more than the actual value of the land. It is the business of the court to ascertain the value of the land as fixed by the parties to this contract, and to require this value so fixed by the parties, to be paid. In the case of *Ambler v. Wyld*, 2 Wash., 36, in a case arising under the act of 1781, which provided that the scaling should be to the true value of the currency in specie, it was urged " that if a new trial of the case was directed, a special direction should accompany it, pointing the jury's inquiry to the value of the property at large, independent of the valuation fixed upon it by the contract;" and Judge Pendleton, in delivering the opinion of the court, says : " This would be highly improper. It was not the intention of the Legislature to let men loose from their contracts, but to allow a departure from the established scale where it was necessary in order to meet the real contract of the parties." Nor was it the intention of our Legislature to let men loose

from their contracts, but their object was to have enforced the real contract of the parties. But various decisions of Court of Appeals of Virginia, are referred to as showing that the fair value of the property ought to be held as the true value of the the number of dollars in confederate currency, mentioned as the consideration to be paid for the property. See *Pharis v. Dice,* 21 Gratt., 303; *Sanders v. Branke,* 22 Gratt., 344; *Meredith, &c. v. Salmon,* 21 Gratt., 762. And it is true that the most usual mode now, of ascertaining the proper scale to be applied in Virginia, is to take the actual value of the property, ascertained by witnesses, as the value of the number of dollars named in the contract, where it is a case of a sale of property made in reference to confederate notes as the standard of value. But these decisions are all based on an amendment to the act of March 3, 1866, which amendment our Legislature has never enacted. See Code of Virginia, ch. 138, §1, p. 980. There was a clerical error in appending this proviso, containing an important and radical amendment to the first, instead of the second section. It ought to have been inserted after the words " particular case," in the middle of the second section of the act, and it is construed as though it was there inserted. See *Pharis v. Dice,* 21 Gratt., 303. This amendment is in these words: " *Provided,* where the cause of action grows out of a sale, or renting, or hiring, of property, whether real or personal, if the court, (or when it is a jury case, the jury) think that under all the circumstances, the fair value of the property sold, or the fair rent or hire of it, would be the most just measure of recovery in the action, either of these principles may be adopted as the measure of recovery, instead of the express terms of the contract." This amendment was adopted February 18, 1867, and though under it, the courts of Virginia after its passage had, where there was a sale of property, generally adopted it as the rule of scaling the fair value of the property sold, as the measure of the true value of the consideration for the sale,

where the contract was made with reference to confederate notes as a standard of value, yet our Legislature after this act had been in force six years in Virginia, refrained from the adoption of this amendment, though they adopted the law which it amended almost *verbatim.* The inference is, that our Legislature purposely refrained from introducing this mode of interpreting, or rather setting aside contracts made during the war in reference to confederate notes as a standard of value. The Legislature of Virginia was driven to this exceedingly questionable amendment by the narrow and contracted interpretation which had been put upon the act of March 3, 1866, on which ours is molded. The history of the passage of this very objectionable amendment is given by Judge Christian in delivering the opinion of the court in *Pharis v. Dice,* 21 Gratt., 303, and should be attentively considered before our courts adopt a construction of our act so contracted and unreasonable as may compel our Legislature to adopt some act like that of the Virginia act of February 18, 1867, or else result in almost, if not quite, as gross injustice, as though contracts, which had been made in reference to confederate currency as a standard of value had been enforced as if they had been specie contracts. For in this opinion, Judge Christian says, that this contracted construction of the act of March 3, 1866, by the Virginia courts, resulted in some cases in compelling the conveyance of land for *one-tenth* its value at the time of the contract. The mere statement of this result, shows that this construction of this act utterly failed to carry out as the act intended the *true* understanding of the parties. For a man would be regarded as little above an idiot, who really intended to sell his property for one-tenth of its value at the time of the sale. Judge Christian, in this case, 21 Gratt., p. 308, says:

"But numerous cases arose in the courts where the contract grew out of a sale, or renting, or hiring of property, when it became manifest that the adjustment of

the rights and liabilities of the parties by the scaling of the obligation from its nominal to its real value in gold, did not meet the plain objects of the act of March 3, 1866, and the requirements of justice and fair dealing. It was found in many cases of this class, when possession and title of the property had been delivered and transferred upon an obligation to pay confederate money, that the nominal price, when reduced to its real value, was so inadequate, when compared with the value of the consideration received, as to shock the conscience and work the grossest injustice. This grew out of the fact that the *purchasing* value of confederate money was much greater than its value, as compared with gold, which had ceased to be a circulating medium, and was, indeed, a commodity; and in many cases parties were found in the possession of real and personal property for which they had never paid a dollar, but only given their obligations solvable in confederate currency, or entered into with reference to that currency as a standard of value, in which if the legislative rule of adjustment was to prevail in all cases, by simply reducing its nominal value to its value in gold, the defendant would be permitted, in such cases, to retain possession of property, or have the title confirmed in him, by paying, oftentimes, *one-tenth* of its real value at the time the contract was entered into. It was to prevent this injustice, so apparent and so shocking to every sense of right, that the Legislature amended the original act by the act passed February 18, 1867."

The court, in this case, pressed by the crying injustice produced by their interpretation of the act of March 3, 1866, held this amendment of February 1867, constitutional. But it seems to me that its effect is not only to impair the obligations of the contract, but to annul the contract so far as its most important feature, the price of the property, is concerned.

As I interpret the act of March 3, 1866, which is the model of ours, it would not have produced the gross injustice of which Judge Christain complains. That

gross injustice was not the legitimate result of this act, but was produced by what I conceive was a false interpretation of the act, by the Virginia court. That act simply provided that the nominal amount due in confederate notes should be reduced to its *true value*. The Virginia courts by its true value understood its value in gold and then wrongfully estimated this gold value by the price at which gold happened then to be selling for confederate notes in the confederate states Now the value of gold in the confederate states, measured as above by the quantity of property, real or personal, it would buy was at times during the war from five to ten times the value of gold any where else. Now the *true value* of the confederate notes to be ascertained under the act of the Legislature was their value in gold in its normal state that is its value elsewhere and not the ficticious or inflated value of gold in the confederate states. Gold is regarded as having a fixed and uniform value throughout the civilized world. It is to this fixed and universal value of gold as I interpret the act of March 3, 1866, to which the nominal amount of confederate notes named in the contract is to be reduced, for this reduction shows in the language of the act, the *true value* of the confederate notes; and the error of the Virginia court, which resulted in such monstrous injustice, was in reducing the confederate notes, not to this their *true value*, their value in gold, fixed and uniform throughout the civilized world, but to the value in gold in its inflated condition in one particular country, the confederate states, a country in which gold became worth from five to ten times as much as it was anywhere else, because the whole of this country being blockaded. Gold became an article of merchandize there, and being much demanded by speculators who were engaged in running the blockade, and by the confederate government its value was raised far beyond the fixed and uniform value it would otherwise have had. But it may be asked how can a comparison be made be-

tween the value of confederate notes at any particular time and this fixed and uniform value of gold? As confederate notes did not circulate out of the confederate states, how can their value be compared with that of gold, out of the confederate states? There is some difficulty in making this comparison, but it is by no means insuperable. In a normal condition of affairs the value of a bank note in gold, and the purchasing value of such bank note is precisely the same. Now, the purchasing value of confederate notes, at any particular time, may be ascertained, at least proximately, and this purchasing value will represent correctly the true value of confederate notes at that time, as compared with gold in its normal state, that is, a comparison with the fixed and uniform value of gold. For example, if at any given time, $3.00 in confederate notes purchased as much property, real or personal, on an average as $1.00 in gold did in its normal state, just before the war, the value then of confederate notes as compared with gold in its normal state, its fixed and universal value would be as one to three, though at that time it may have taken $20.00 in confederate notes to purchase $1.00 in gold in Richmond. To find, then, the *true value* of confederate notes, at any time, as compared with this fixed and uniform value of gold throughout the world, we would simply have to ascertain the apparent average appreciation of all property, real or personal, since the commencement of the war. A comparison of the average prices of property, real or personal, just before the war, with the prices of such property in confederate notes, at a given time, will show the then depreciation of confederate notes as compared with the fixed value of gold. Had this mode been adopted as the mode of finding the true value of confederate notes, no such gross injustice as Judge Christain has pointed out would have resulted from scaling the confederate notes under the act of March 3, 1866, and no necessity would have arisen for the passage of the act of February 18, 1867. Nothing, it seems to

me, can be more unjust, when gold had entirely, or almost entirely, disappeared from the remote counties, such as Monroe, and when, by reason of the blockade, its value had been enhanced from five to ten fold in Richmond, than to regard it then, in its inflated value, as the standard of value to which the currency of the people was to be reduced in every contract made by them. The result of such scaling would, as Judge Christian justly says, "shock the conscience." The act of 1781, passed, under a state of affairs similar to that under which the act of March 3, 1866, was passed, required the reduction of the currency to its specie value, and the Legislature fixed for each month of the war the value of gold, and this value was fixed without reference to the price at which gold actually sold, but with reference to the purchasing value of the depreciated currency. These values of gold, as fixed by the Legislature of 1781, were the normal or fixed value of gold, as compared with the currency, and not the actual prices at which gold was selling. When this act was passed, the constitution of the United States, forbidding the impairing of the obligation of contracts, had not been adopted; and the Legislature had then a right to do themselves what they must now leave to the courts to do—find the true value of the currency—and I can perceive no violation of the constitution in the courts being authorized to find the true value of confederate notes by ascertaining their *purchasing* value and then scaling them to their *true value*. For in so doing, the courts, so far from impairing the obligation of contracts, are only enforcing them according to the *true* understanding of the parties. The circuit court has followed the Virginia decisions under the act of March 3, 1866, and has scaled the currency to the value of gold as it was then selling in Richmond, and not to its fixed and universal value as shown by the average enhanced prices of real and personal property in Monroe county, as compared with their prices just before the war.

1877.
January Term.

Bierne
v.
Brown's adm'r
et al.

The decree of May 15, 1874, must, therefore, be reversed and annulled, and the cause recommitted to a commissioner, with instructions that in ascertaining the cash value, in gold, of the balance due upon the contract between Bierne and Brown, and in ascertaining the cash value of any balance due from sub-purchasers, if their purchases were made in reference to confederate notes as a standard of value, as ordered by the decree of October 20, 1873, the commissioner shall not base his calculations on the relative value of confederate notes and gold, as shown by the prices at which gold was selling in Richmond in confederate currency, but upon the relative value of confederate notes and the value of gold just before the commencement of the war, as shown by the apparent appreciation, on an average, of all kinds of property in Monroe county, real and personal, when sold for confederate currency, or with reference to it as a standard of value. And upon the return of said report, the court shall take such further proceedings as are consonant with the rules of equity and justice, and with the principles laid down in this openion.

DECREE REVERSED and cause remanded.