## Wheeling.

GILKESON *v.* SMITH *et al.*

Decided April 26, 1879.

Absent, MOORE, JUDGE.

1. Greenbrier county during the late war was under control of the government of Virginia, at Richmond; and the only currency in circulation there was Confederate notes. A sale of real estate was made September 12, 1863, in that county at public auction. The purchaser bought it at $3,800.00, and paid down in Confederate notes $715.00 in cash, and executed his bond for the balance of the purchase-money, payable in Confederate notes on or before September 10, 1864. He paid thereon on November 18, 1863, in Confederate notes, $1,050.00. HELD:

The balance due upon this bond must be scaled as of November 18, 1863, and the scaling must be done in the manner directed in *Bierne* v. *Brown*, 10 W. Va. 748.

2. When property is sold between May 1, 1861, and May 1, 1865, and at the time and place where the sale is made Confederates notes are the currency in circulation, in the absence of proof that the sale was made on the basis of gold as the standard of value the price of property must be scaled according to the act of April 7, 1873.

3. If the note given for such sale of property is silent as to the currency in which it is to be paid, in the absence of other proof the scaling must be as of the date of the sale, though the note be payable at a future day.

4. If the note given at such a sale is payable on its face at a future time in Confederate notes, the scaling must be in the absence of other proof as of the date the note is payable.

5. A party, who in a court of equity or law relies on a tender of money in satisfaction of a debt, must bring into court, when he files hi

pleading setting up such tender, the amount of money so tendered, unless this production of the money is waived by the other side; and if he fails to do so, this defense to the payment of the debt and any proof in relation thereto will be disregarded by the court.

Appeal from an order of the circuit court of Greenbrier county, made on the 19th day of June, 1875, and a decree of the said court rendered on the 22d day of October, 1875, in a cause in said court then pending, wherein Samuel Gilkeson was plaintiff and Agnes M. Smith and others were defendants, allowed on the petition of said defendants.

Hon. Homer A. Holt, judge of the eighth judicial circuit, rendered the order and decree complained of.

GREEN, PRESIDENT, furnishes the following statement of the case :

In August, 1874, Samuel Gilkeson filed his bill in the circuit court of Greenbrier county to enforce against Agnes M. Smith, Elizabeth I. L. Jones, Philip Duffey and Sarah R. his wife and Francis B. Smith, widow, children and devisees of Wm Smith, deceased, the specific execution of a contract of a sale of an half acre lot and house thereon in Lewisburg in said county. The bill alleges that on June 23, 1863, Wm. Smith made his last will, whereby among other things he constituted John W. Jones, his son–in–law, his executor to sell and convey any real estate he might have, and soon thereafter died. That Smith then resided in Bedford county, Virginia. And on July 27, 1863, his will was admitted to record by the county court of Bedford county ; and Jones then qualified there as his executor. This will, probate and qualification are copied in the case of *Smith et al.* v. *Henning*, 10 W. Va., 596. On the 10th day of September, 1863, Jones, the executor, his mother-in-law, Agnes M. Smith, being present, sold in Lewisburg this house and lot at public sale ; and it was bought by the plaintiff, Gilkeson; and the following paper showing the terms of sale was then executed by J. W. Jones, the executor.

"I, John W. Jones, executor of William Smith, deceased, have this day received of Samuel Gilkeson, $715.00 on account of one half acre lot number forty-seven in the town of Lewisburg sold by said Jones, executor, on the 10th day of September, 1863, at which sale said Gilkeson became the purchaser at the sum of $3,800.00. So soon as the residue of said purchase—$3,100.00, and the interest accruing are paid, then the said Jones, executor as aforesaid, binds himself to make a deed to said Gilkeson for said property. Given under my hand and seal this 12th day of September, 1863.

[Seal.]                "JOHN W. JONES."

The bill further alleges that this sale was made for Confederate money, the executor having proclaimed in the presence of Agnes M. Smith, his mother-in-law, that this kind of money was as good as he wanted. The bill also alleges that the plaintiff, Gilkeson, gave his bond for this balance of the purchase-money with the privilege of paying it all in this kind of currency within twelve months; and that the plaintiff, Gilkeson, was directed to deposit the balance of the purchase money, or such part as he might be able to pay, in the Farmers' Bank of Fincastle; and shortly after he did deposit in this bank to the credit of said Jones $1,050.00, and gave him notice thereof, but he does not know whether he drew it from this bank; and the balance he had tendered to him in March, 1864, but he refused to receive it, as he said in a letter, because it was old issue, when in fact there was then no new issue. The letter referred to is as follows:

"THUXTON's, August 22, 1864.

"SAMUEL G. GILKESON, ESQ.:

"*Dear Sir:*—Yours by Mr. Bowels and my son was received; and I must confess I was very much surprised at the position you take in regard to the debt you owe me as the representative of William Smith's estate. Your intelligent counsel should have told you what constituted a tender, when he advised you not to pay a just debt. I have taken no counsel on the subject, but my understand-

ing of the meaning of the bond in giving you the privilege of paying in Confederate money in twelve months, does not extend beyond that time. Your agent made no tender in the eye of the law. He did not have the money to tender. He proposed to pay some money after it was depreciated, and talked of some money which he said was placed to my credit in the bank at Fincastle, a deposit I never authorized or sanctioned. I have been willing to take the amount of the bond at any time from the time it was executed to present time in current Confederate paper, or notes, or money, as you please to call the currency, and still am willing, and will be until the expiration of twelve months from the time the bond was executed and so told your agent.

"Most respectfully,

"JOHN W. JONES."

The bill further alleges that the plaintiff, Gilkeson, had been in the possession of this house and lot ever since this sale, and that Greenbrier county was then and continued during the war under the control of the government of Virginia, at Richmond, and that said Jones has died, and Alexander Knight had been appointed administrator *de bonis non* with the will annexed of William Smith; and that he refuses to make a deed for the house and lot to the plaintiff, Gilkeson. The bill asks a specific execution of the contract and makes said devisees of Wm. Smith and Alexander Knight, his administrator *de bonis non* with the will annexed, and James Knight administrator of John W. Jones, defendants.

The bill was answered by Agnes M. Smith, Elizabeth I. L. Jones and Sarah R. Duffey, devisees of William Smith, deceased, and was taken for confessed as to the the other defendants.

The answer of these devisees states the facts with reference to the death of William Smith, denies the validity of the probate of his will by the county court of Bedford, the validity of the qualification of John W. Jones as his executor; but as these points were decided by this court

in the case of *Smith et al.* v. *Henning,* 10 W. Va. 596, it is unnecessary to state the grounds on which they based these positions in the answer. They say that the will did not authorize the executor to sell the land, at least to sell the land except for the payment of debts. and that it was not sold for that purpose ; and they never approved the sale of this house and lot or received any part of the purchase-money ; and that J. W. Jones died insolvent. They deny that this house and lot was sold for Confederate currency, or that any portion of the purchase-money was paid or tendered, except the $700.00 on the day of the sale; or that J. W. Jones authorized the plaintiff, Gilkeson, to deposit any of the purchase-money in the Farmers' Bank of Fincastle, or that he ever had any notice of the deposit in Jones's name : or that Jones, if really the executor of William Smith's will, had any right to sell the property for Confederate currency. They deny that admissions made by them in *Smith* v. *Gilkeson et al,* 5 W. Va., are binding on them in this case, as those admissions were made by their counsel only for the purposes of that suit. The other facts stated in the bill are admitted.

During the progress of the suit it was agreed that the depositions of Joel McPherson, Robert F. Dennis and Samuel Gilkeson, the plaintiff, taken in that case might be read as evidence as if taken in this case, subject to any exceptions on account of Gilkeson's alleged incompetency as a witness. The letter above of J. W. Jones was admitted also as evidence, and its genuineness agreed to, and that two exhibits filed with the bill—that is the contract signed by J. W. Jones and the certificate of the cashier of the Farmers' Bank of Fincastle of the deposit by Samuel Gilkeson, to the credit of John W. Jones, administrator of William Smith, on November 18, 1863, of $1,050.00, were also agreed to be used and read in this cause, as if they were the original papers and genuine ; the latter to be subject to the exceptions for want of materiality.

Joel McPherson's deposition states, that when the house and lot were sold, Jones proclaimed that he would receive Confederate money in payment; that a part of the money was then paid, and a note and security given for the residue; and that it was understood between the parties that the residue would be deposited in some bank in Fincastle.

Dennis also proves that such proclamation was made by Jones at the time of the sale; and that Mrs. Agnes M. Smith was present, and remarked during the sale, that she wanted the property sold.

Gilkeson, the plaintiff, in his deposition states, that the property was sold for Confederate money to be paid down thenor afterwards. He gave his note for the residue not paid, payable in twelve months in Confederate money. He had his option to pay in Confederate money, if it was paid in twelve months; that according to Jones's direction he deposited a few weeks after $1,050.00 to Jones's credit in the Farmers' Bank, of Fincastle, Va.; and the balance of the purchase money he sent to Jones in March, 1864, who objected by letter to receiving it when tendered, because it was the old issue of Confederate notes; and he also proved the same facts that Dennis and McPherson proved as to what took place at the time of the sale. Witness in this case proved that at the time of the sale this house and lot was worth in good money about $1,200.00; and R. B. Moorman testified that between the 5th and 20th of March, 1864, at the request of Samuel Gilkeson, he took to J. W. Jones some Confederate money, he did not recollect the amount, and does not know whether it was the old or new issue of Confederate notes; he tendered this money to Jones, who declined to receive it, stating he acknowledged the tender but would not receive it, but he did not remember the reason he assigned. When this money was handed me by Samuel Gilkeson, he said it was a payment due for real estate he had bought.

Samuel Gilkeson, the plaintiff, deposed that he sent by

7

Moorman $2,150.00, and that he had since kept it on hand and produces it. He says this is the same money, except the old issue was exchanged for new, reducing the amount one-third, and he added new issue to make up the amount.

Replications were filed to the answers; and the cause being ready for hearing, the court on November 21, 1874, decreed that the plaintiff was entitled to a specific performance of the contract, but that there was a balance still due from him, and referred the cause to commissioner Withrow to report the balance, directing him to charge the plaintiff with $3,800.00 as of September 12, 1863, credit him with the cash paid then, and with $1,050.00 as of November 18, 1863, and calculate the interest to the time of the tender by Moorman for the plaintiff; and the balance so found due was to be reduced to its gold value at that time, and bear interest from that time; but further directing to report the proportion which this balance bore to the whole purchase-money, and the value of the house and lot in good money at the day of the sale; and also any other statements the parties might request.

The commissioner reported that the value of the house at the time of the sale in good money was $1,200.00. He made a statement showing that the principal and interest due on March 5, 1864, after the crediting of the cash payment $715.00 and the $1,050.00 deposited in bank November 18, 1863, was $2,105.11; and estimating $23.00 in Confederate currency to be worth $1.00 in gold he reduces this balance to $91.40; and the interest on it to November 5, 1875, will make the balance then due $155.16. Other statements were made by the commissioner by request of the parties; but it is unnecessary to state them, as this was the statement approved by the court by its decree of October 30, 1875. The court thereupon decreed that Alexander Knight, administrator *de bonis non* of William Smith, deceased, do recover of the plaintiff, Samuel Gilkeson, $155.16, with interest

from November 3, 1875, till paid; and upon its payment the court ordered a deed with special warranty to be made by a commissioner for the defendants to the plaintiff of this house and lot; and unless it was paid in ninety days, he ordered a sale to be made of the house and lot to pay the same.

Exceptions were filed by the defendants to the commissioner's report, first for the allowance of the credit of 1050.00, and because of the scaling of the balance as of March 5, 1864, instead of September 12, 1863, the date of the sale, and because it puts the value of the property too low. The plaintiffs except to the report, because they are charged with $91.46, with interest from March 5, 1864, when, they insist, they tendered the whole amount due and still have this amount on hand in Confederate currency. The commissioner's report states that the gold value of the balance due March 5, 1864, was found from a printed table in the possession of the commissioner heretofore used by him and approved by the court. He doubtless refers to the printed table found in *Bierne* v. *Brown*, 10 W. Va. 753, being a table of the prices at which gold sold in Richmond, the price of gold being put in this table for March 1864, at from $23.00 to $24.50 in Confederate notes. These exceptions were all overruled by the court in the decree of October 30, 1875. Agnes M. Smith, Elizabeth I. L. Jones, Sarah R. Duffey and Alexander Knight, administrator of William Smith, obtained an appeal to these decrees of June 19, 1875, and October 22, 1875.

*A. C. Snyder* and *Mathews & Mathews*, for appellants, cited the following authorities:

10 W. Va. 748; 34 Ala. 126; 22 Ill. 643; 2 Dall. 190; 15 Wend. 627; 12 How. Pr. 490; 1 N. J. L. (Cone) 174; 1 Cranch 263; 12 La. Ann. 266; 21 Gratt. 556.

*Samuel Price,* for appellees, cited the following authorities:

1879
Special Term.

Gilkeson
v.
Smith et al.

Story on Contr. §808 ; 2 Kent. Comm. 400, 401 n. g. ;
Chipman on Contr. 25, 26 ; Coke Litt. a. ; 10 W. Va.
784 ; 3 T. R. 683 ; 20 Barb. 509 ; Id. 61 ; Id. 497 ; 6
Bac. Abr. 447.

GREEN, PRESIDENT, delivered the opinion of the
Court :

The answers in this case controvert the authority of
John W. Jones to sell the house and lot, the subject of
controversy, and dispute the validity of the probate of the
will of William Smith by the county court of Bedford,
and the validity of the qualification, as his executor, of
John W. Jones before that court. This question was
expressly decided in favor of his authority in the case of
*Smith et al.* v. *Henning,* 10 W. Va. 596. It is true that
in that case this Court decided that the authority con-
ferred by William Smith's will on his executor, John W.
Jones, conferred simply a power to sell and not a power
coupled with an interest; and that this power was con-
ferred simply to pay debts, and for no other purpose ;
and that if under this power John W. Jones as executor
of William Smith, sold his real estate to raise money to
be applied to any other purpose, *and the purchaser had
notice thereof,* such sale would be constructively fraudu-
lent as to the devisees. There is not however in this
case the least evidence to show that the purchaser, Gil-
keson, had any notice that this sale was not made for
the purpose of paying William Smith's debts. And
though the validity of the sale was controverted by the
answer, this question was afterwards abandoned by the
defendants. The contract of sale was in this case in
writing ; and the plaintiff, Gilkeson, was put into the pos-
session of the property ; and it is now admitted, that on
his compliance with the terms of the contract he was en-
titled to a deed for this property.

The question really in controversy now is, whether he
had paid the entire purchase-money, or tendered the
same ; and if not, how much he has paid, and how any

1879
Special Term.

Gilkeson
v.
Smith *et al.*

balance that may be due from him is to be scaled, if the contract and sale according to the true understanding of the parties was made with reference to Confederate notes as a standard of value, or was to be paid in Confederate notes.

The circuit court decided that the plaintiff, Gilkeson, was entitled to a credit of $715.00 paid on the day of sale September 12, 1863, and to a further credit of $1,050.00 deposited in the Farmer's Bank of Fincastle on November 18, 1863, to the credit of J. W. Jones as executor of Wm. Smith. It is admitted that the first credit of $715.00 was properly given. The second credit of $1,050.00 was also properly allowed. It is proved by Joel McPherson that on the day of sale Jones suggested that the residue of the purchase-money of this house and lot should be deposited in some bank in Fincastle; and Gilkeson assented to this proposal. Jones in his letter to Gilkeson speaks of the deposit in *the bank* at Fincastle and in the absence of all evidence we must assume that there was but one bank there, and that it was the Farmers' Bank of Fincastle in which it was agreed that the after-payments should be deposited. That this deposit of $1,050.00 was actually made there to the credit of Jones is not controverted; but it is claimed he was not notified thereof. If such notice was deemed essential it is supplied by the letter of Jones to Gilkeson, which shows that in March, 1864, he was informed by the agent of Gilkeson that a deposit had been made in the bank to his credit. It is true, in this letter he says he never authorized or sanctioned this deposit; but this letter was written after the controversy between the parties had arisen; and it cannot outweigh the sworn statement of McPherson. Indeed the mere fact, that a deposit was made by Gilkeson in a bank distant from his residence, itself renders the statement of McPherson highly probable. It is difficult to conceive why this deposit should be made in a distant bank to the credit of Jones, unless it was made pursuant to an understanding between the

parties.   It is said however, McPherson testifies that the residue of the purchase-money was to be deposited in this bank, and this authorized only the deposit of the whole residue, and not a part of it.   This would, it seems to me, be an unreasonable inference as to what was the agreement, more especially as Jones does not in his letter dispute the validity of this payment because it was only a part of the balance.   He does not base his assertion, that this deposit was not authorized, apparently on such grounds; but he denies generally that he authorized any deposit in this bank.   McPherson proves the contrary; and the court properly allowed this credit.

The decree entered by the circuit court is based on the assumption, that no legal tender of the balance of the purchase-money was made.   This assumption of the court, it seems to me, was necessitated by the fact that the pleadings in the cause did not put in issue the question, whether any legal tender was made.   Whenever a party relies on a tender as a discharge of a debt, he must bring the money into court; and when the pleading setting up the tender is filed, he must offer the money to his creditor.   Without now considering the proper form of making this offer, it is clearly essential, if a party relies on a tender, that he should bring the money into court and offer it to his creditor.   It is true that this is not required, if the defense offered is a tender of ponderous goods, for obviously this would be impracticable. See Co. on Litt. 250 b ; *Peytoe's Case* 9 Co. 79 a; *Stingerland* v. *Morse*, 8 Johns. 478; *Jones* v. *Stevenson*, 5 Munf. 1.   But this bringing the money into court, unless waived, is always required, when a debt is claimed to have been discharged by tender of money; for otherwise the creditor, if the tender was proved, would lose his debt; whereas in the case of goods, if the tender is established, the goods belong to the creditor, and the party in possession of them is regarded as his bailee. See *Pelter* v. *Shelton*, 1 Strange 638; *Bray* v. *Booth*, Barnes 252; *Chapman* v. *Hick*, 2 Cromp. & M. 633;

*Eddy* v. *O'Harra*, 14 Wend. 224; *Brooklyn Bank* v. *DeGraw*, 23 Wend. 394; *Chaflin* v. *Hawes*, 8 Mass. 261. And if the money is not brought into court, the defense of tender is disregarded by the court, as these cases show.

This rule is not at all relaxed, when by the contract the debt may be paid in money or notes which, when the defense is set up, is uncurrent, depreciated or not a legal tender, with this modification, that the debtor may then bring into court the *identical money or notes* which he tendered. But if he fails to do so, or to bring into court legal tender money, his defense of a tender will not be received or considered. See *Pong* v. *DeLindsay*, &c., 1 Dyer 82 a, where the plea set up a tender of uncurrent money, which was current when the debt fell due, but which offered the *identical* money which had been tendered; and the court held the plea good; and *Dowman* v. *Dowman's ex'r*, 1 Wash. 26, where the plea was rejected, because it did not bring into court, and offer to the plaintiff, the Virginia notes called for in contract tendered, which were not current when this defense was made.

It seems to me that the requirement, that the *identical* notes tendered should be brought into court when at the time the defense is made they are uncurrent or valueless, is essential to justice; for otherwise the debtor may have used the notes tendered, when they had a value, and obtained to present to the court the same amount of notes when they became uncurrent and valueless. But be this as it may, it is certainly necessary that the party relying on the tender must bring into court the amount he alleges he tendered, and offer it to his creditor, or his defense will be disregarded by the court. In the present case before us the plaintiff, Gilkeson, when he filed his bill, did not bring the money he alleged he tendered into court, or any other money. He did not even allege the amount he so tendered, or that he had kept it since the tender for his creditor, or make any offer of it to him. All that he alleges in his bill is "that the balance of the

purchase-money he sent to Jones, and had the same tendered to him within twelve months. The tender was made in March, 1864, he refused to receive, as he wrote the plaintiff, because it was the old issue of Confederate notes, when in fact at that time there was no new issue of such money."

The rules we have stated, though found in common law cases, are equally applicable to chancery causes. They are based on reasons which apply to one court as well as the other, and are not technical in their character; and it is obvious that the plaintiff's bill does not in this case come up to the requirements of the law. No money was brought with his bill into court; and no offer to pay the amount tendered to the plaintiff. It is not improbable that the necessary allegations to make this tender available were not made, because the plaintiff knew that he could not bring the *identical* notes he claims to have tendered into court; and this he may have regarded as essential to make his tender of any avail to him before the court. But whatever may have been his reason, and whether it was absolutely essential to produce these identical notes or not, it is certain that he did not offer his claim to be exempt from the payment of the balance of this purchase-money, because of this alleged tender, in a manner which justified the court as regarding it, even if it had been proven. His bill did not in a legal manner offer an issue on the question of this tender; and it not being put in issue, any evidence in reference to it was irrelevant to the case, and could not be properly considered by the court. See *Hunter's ex'rs* v. *Hunter et al.*, 10 W. Va. 321.

I shall not therefore consider the questions discussed by counsel, whether Gilkeson was a competent witness to testify on this subject after Jones's death, or whether his testimony, if competent, and that of Captain Moorman taken in connection with the letter of Jones established the fact, that a tender of $2,150.00 was made in March, 1864. This testimony related to a matter not in issue, and for

that reason must be disregarded. I am of opinion that the circuit court did not err in refusing to allow this credit of $2,150.00. The true balance then due by the plaintiff, Gilkeson, on the purchase of this house and lot was $2,068.91 with interest thereon from the 8th day of November, 1863.

It only remains to enquire whether this balance is to be scaled, and if so, at what date shall it be scaled, and what is the proper mode of scaling it. That it should be scaled is perfectly apparent. The sale of this house and lot took place in 1863, in Greenbrier county, which it is admitted was during the whole war under the military and civil control of the government of Virginia, at Richmond, and that Confederate notes was the currency in circulation then in that county. This alone would make it necessary and proper to scale this debt, unless there was proof that the sale was made on the basis of gold; and so far from this being shown, it is expressly proven that when it was made, Jones, the party making the sale, proclaimed that Confederate notes was as good money as he wanted. Our statute of April 7, 1873, " providing for the adjustment of certain liabilities arising under contracts made between the 1st of May, 1861, and the 1st of May, 1865," provides, that " whenever it shall appear that such contract was, according to the true understanding and agreement of the parties, to be fulfilled or performed in Confederate States treasury notes, or was entered into with reference to such notes as a standard of value, the same shall be liquidated and settled by reducing the nominal amount due and payable under such contract in Confederate States treasury notes, or Virginia treasury notes, to its true value at the time they were respectively made and entered into, or at such other time as may to the court, or, if it be a jury case, to the jury, seem right in the particular case." Acts of 1872–3, ch. 116, p. 307.

That this contract comes within this act and should be scaled is obvious. But whether the scaling under it should be as of the date of the contract, September 10,

1879
Special Term.

Gilkeson
v.
Smith et al.

Syllabus 2.

1879.
Special Term.

Gilkeson
v.
Smith et al.

Syllabus 3.

Syllabus 4.

1863, or at a subsequent day is not so obvious. The circuit court scaled this contract as of the 5th of March, 1864. The time of the scaling of the contract must depend upon "what was the true understanding and agreement of the parties, either expressed or implied, in respect to the kind of currency in which it was to be fulfilled, or performed, or with reference to which as a standard of value it was made and entered into." To show this the first section of this act permitted the introduction in any case of parol or other relevant testimony. If a note, which under this act should be scaled, was payable on demand, of course the scaling must be as of the date of the note. If such note was given payable at a future day, if upon all the evidence it appeared to have been given simply *with reference to Confederate notes as a standard of value,* the scaling should be as of the date of the note. and not as of the time when the note became payable. But if on the other hand the evidence shows that the note was not simply given with reference to Confederate notes as standard of value, but that the parties in executing the note or making the contract, the basis of the note, had in contemplation the change in value of Confederate notes between the date of the note and the time it was payable, and intended that it should be paid in Confederate notes at the time the note was payable, no matter how much they might then be depreciated, the scaling must in such case be as of the time when the note became payable.

These views were expressed by me in the case of *Bierne* v. *Brown's adm'r* ; and on further consideration of the subject I see no reason to change them. I there say, see 10 W. Va. p. 759 : " If a contract required the payment of Confederate dollars, or if by parol proof it was shown that this was the express understanding of the parties to the contract, this would have been a contract of hazard, and the obligee would have had to receive, in payment of such an obligation, the number of Confederate dollars named in the contract, no matter

how depreciated they might have been when they were to be paid under the contract. But if the contract did not require the payment in 'Confederate dollars,' and the parol proof did not show the express understanding of the parties was that the payment was to be made in Confederate dollars, but only showed that the contract was entered into with reference to Confederate currency as a standard of value, then such contract ought not to be regarded as a contract of hazard, and it ought not to be held that payment was to be made in Confederate dollars,·no matter how much depreciated when the money· became payable, as the parties to such contract must have known, what none could fail to observe, that Confederate notes were constantly and rapidly depreciating. The fair inference to be drawn from the simple fact that the contract was to be fulfilled in Confederate notes as a currency would be, not that the contract was to be fulfilled in Confederate notes calling for the number of dollars named in the contract, which the parties knew would be much more depreciated at the day of payment, but rather that the *then value* (*i. e.* the value at the date of the contract) of the number of dollars required to be paid, estimated as Confederate dollars, should be paid, when by the contract they became due, in the currency, whatever it might be, in circulation when it was to be paid.

"The contract so interpreted would have no sort of reference to the currency in which it was to be fulfilled; but the Confederate notes would be regarded simply as a standard of value, which the parties had reference to, whose *then* value was to be paid at a future time. So understood, a contract made during the war, when and where Confederate notes were the sole currency, in the absence of proof must be regarded as made with reference to Confederate notes as a standard of value. But such a contract ought not, in the absence of proof, to be regarded as a contract of hazard, as it would be if it was interpreted that it was to be fulfilled by the payment of

the number of dollars called for in so many Confederate dollar notes.   The more recent and sounder Virginia' decisions are really based on this construction of the statute, though it is not so avowed.   See *Stearns* v. *Mason*, 24 Gratt. 493; *Myers* v. *Whitefield*, 22 Gratt. 780.   These latter decisions too accord with the decisions of the Court of Appeals of Virginia under the act of 1781, which was very similar to our act, and was passed to remedy the same evils arising during the revolutionary war out of the depreciation of the then currency of the State.   See *Pleasants* v. *Bibb*, 1 Wash. 8; *Wilson & McRae* v. *Keeling,* 1 Wash. 194; *Ambler* v. *Wyld*, 2 Wash. 36; *White* v. *Atkison*, 2 Wash. 94; and the review of these cases by Judge Moncure in *Dearing's adm'r* v. *Rucker*, 18 Gratt. 465, in which he gives the substance of the act of 1781."

Syllabus 1.[9]   In applying these principles to the case now before the court, we must determine, whether in point of fact the bond given for the residue of the purchase money was on its face made expressly payable in Confederate notes.   The bill expressly alleges that it was payable on or before twelve months from its date, and that it was on the face of the bond expressly stipulated that it might be discharged by the payment of Confederate notes within that time.   The answer denies that the sale was made for Confederate notes; but it admits that the purchaser, Gilkeson, executed his bond for the payment of the residue of the purchase-money, and that it was payable twelve months after date.   But the answer does not say whether or not it was payable in Confederate notes, though perhaps from the denial that the sale was made for Confederate notes, it may be inferred, that the answer did not mean to admit the statement of the bill that this bond was payable on its face in Confederate notes.   And the burden was thrown on the plaintiff to prove this allegation:

The only proof on the subject is the letter of obligee in this bond, John W. Jones, written to the plaintiff, Gilkeson, and written about three weeks before the bond

became due. In this letter he says: "My understanding of the meaning of the bond in giving you the privilege of paying in Confederate money within twelve months, does not extend beyond that time. I have been willing to take the amount of the bond at any time from the time it was executed to the present time in current Confederate paper or notes, or money as you please to call the currency, and still am willing, and will be till the expiration of the twelve months from the time the bond was executed." This bond is in the possession of the defendants or one of them, it is to be presumed, and might have been produced. Not having been produced, this letter I think sufficiently proves that it was on its face expressly payable in Confederate notes. How exactly it was worded it may be difficult or rather impossible to determine, but even if the interpretation put upon this bond by the obligee had been expressly stated on its face, and it had only given the obligee a right to pay off this bond in Confederate notes at any time before it became due, and had further said that after that time it would not be paid off in Confederate notes, still this would have been obviously a contract of hazard during this twelve months; and as at the expiration of that time it would, as admitted by the obligor, have been his duty under this bond to have received Confederate notes to the amount called for by the bond on its face in full discharge thereof, all the injury which resulted to him by the failure of the obligor to make this payment is the value of this number of Confederate notes at the time they were required to be paid by the note, that is the value of these Confederate notes on the 10th day of September, 1864. The scaling therefore should have been in this case made as of the time this note became due, September 10, 1864, and the circuit court erred in scaling it as of March 5, 1864.

The court also erred in the mode adopted by it of scaling this debt. It reduced it to one twenty-third part of the nominal amount due on the bond, because one dollar

in gold sold for twenty-three dollars of Confederate notes in Richmond on March 5, 1864, when the court decided the scaling was to be made. This mode of scaling is expressly condemned by this court in *Bierne* v. *Brown's adm'r et al.*, 10 W. Va. 748, decided since the rendition of the decree in this case by the circuit court. According to the rule laid down in that case, and which must be followed in this, the balance due on the purchase of this house and lot on September 10, 1864, was $2,193.00. The value of this amount of Confederate notes on the 10th day of September, 1864, must be ascertained, and when the plaintiff, Gilkeson, has paid this value with interest thereon from September 10, 1864, a deed should be made to him for this house and lot; and if he fails to pay it in a reasonable time, this house and lot should be sold to pay this debt; and the proceeds of the sale after the payment of this debt should be paid to the plaintiff.

The value of $2,193.00 in Confederate notes on the 10th day of September, 1864, must be ascertained in the manner prescribed by this court in the case of *Bierne* v. *Brown*, 10 W. Va., p. 748, that is, the depreciation of the purchasing value of this $2,193.00 of Confederate notes should be ascertained by the circuit court by determining the average apparent appreciation in value on September 10, 1864, of property, real and personal, in Greenbrier county as compared with prices just prior to the war. The injustice of the rule of scaling adopted by the circuit court is well illustrated in this case. If the scaling had been done by the rule of the circuit court as of the date of sale, the reduction of the value of the Confederate notes would have been to about one-twelfth part of their nominal amount, that is, to $172.41 in gold; whereas by the correct rule the reduction as of September 10, 1863, would have been probably to about $650.00. What the reduction will be as of date September 10, 1864, must be determined on the evidence taken after this case is remanded to the circuit court.

The decrees of June 19, 1875, and October 30, 1875,

must therefore be reversed and annulled ; and the appellants must recover of the appellee, Samuel Gilkeson, their costs expended in this Court; and this cause must be remanded to the circuit court of Greenbrier county to be there further proceeded with according to the principles laid down in this opinion and further according to the principles and rules governing courts of equity.

JUDGES HAYMOND AND JOHNSON CONCURRED.

DECREES REVERSED.    CAUSE REMANDED.