# CHARLESTOWN.

## BAILEY *et ux.* v. STROUD AND TRAIL.

### Submitted June 24, 1884.—Decided October 2, 1885.

A tract of land was sold on December 15, 1862 in Mercer county with reference to Confederate States treasury-notes, as a standard of

value, for the price of $1,000.00 of which $500.00 was in hand paid and a bond for $500.00 payable twelve months thereafter given for the residue. In a suit in equity brought by the assignee of the vendor, to enforce the vendor's lien against the land for the amount of the bond of $500.00 given for the unpaid purchase-money. HELD:

I. That the amount of unpaid purchase-money specified in the $500.00 bond must be reduced to its value in gold, as of the date of said bond.

II. That the true value of such Confederate States notes was neither the actual value in gold of the property sold at the time of the sale thereof, nor the actual value in gold of the Confederate "dollars" specified in said $500.00 bond, nor the price at which gold was selling in Confederate States treasury-notes in Richmond or elsewhere in the Confederate States than in said county of Mercer.

III. That the true value of such notes should be ascertained and measured by the average purchasing power of gold in Mercer county of all kinds of property, real and personal, just before the civil war commenced, compared with the average purchasing power of such Confederate States treasury-notes in said county at the date of said bond.

IV. That it was error to assume that the true value of the unpaid purchase-money was the actual value of the land in "good money" at the date of the sale thereof less the amount of the down payment of $500.00; and,

V. That the cause should have been referred to a commissioner to ascertain the true value of the unpaid purchase-money as of the date of December 15, 1862, according to the principles here laid down, and to those established by this Court in *Bierne* v. *Brown's Administrator*, &c., in 10 W. Va. 748.

WOODS, JUDGE, furnishes the following statement of the case:

This was a suit in equity brought at February rules, 1871, in the circuit court of Mercer county by the plaintiff Elizabeth Smith now the wife of Enos Bailey, against William D. Stroud, Matthew Bolton and his wife Mary W. Bolton, and Jacob Trail, which was afterwards transferred to and heard by the circuit court of Summers county. The material allegations of the bill were in substance, that said Matthew Bolton on December 15, 1862, sold to the defendant Stroud, a tract of land in Mercer county containing about 200 acres,

and described as lying "on Davis fork of Brush creek, adjoining lands of Jacob Lawman and others, and is the same land now occupied by said Jacob Trail;" that the price of the land was $1,000.00, of which $500.00 was paid in hand, and for the residue Stroud executed to said Bolton his bond of that date for $500.00, payable twelve months thereafter, that the legal title to said land was vested in the female plaintiff and her sister said Mary Bolton, who were ready to convey the land whenever directed to do so; that the money due upon said bond of $500.00 had been transferred to the female plaintiff, who claims a vendor's lien on said land, which had been sold by Stroud to said Jacob Trail, and prayed for a personal decree against Stroud for the amount of the bond, and a sale of the land to satisfy the same.

The defendants Stroud and Trail answered the bill, but the answer of Stroud is not in the record; that of Trail was filed in September, 1871, and in May, 1873, he filed an amended answer. Taken together Trail's answers admit the sale as set out in the bill, and for defence in substance allege : that the purchase-money was to be paid and so far as the same has been paid, was paid in Confederate States treasury-notes, called Confederate money; that the down payment of $500.00 was paid, in Confederate treasury-notes, and the deferred payment sought to be enforced was to be paid in Confederate treasury-notes, that these notes were tendered at the proper time, and kept, and were always ready for said Bolton, until they became entirely worthless, and he insists, that "he *ought not to be required to pay more than the value of the Confederate notes, when the bond fell due,* if anything," and he averred that at that time such Confederate notes were not worth more than one-twentieth part of the value of gold in Mercer county, and asked that this value may be ascertained, and that he may be required to account only for its value when ascertained. He also averred that said Bolton had sold said Stroud 200 acres, and that he had bought only 100 acres, and asked that the 100 acres retained by Stroud may be first sold to pay the plaintiff's demand. It will be observed that while the defendant Trail does not pretend that any part of the $500.00 bond has ever been paid by Stroud or himself, or that the same is not a vendor's lien on the land owned by him, he

tacitly admits that he is bound to pay whatever amount may be ascertained to be due thereon, and only insists he shall not be made liable for any greater sum.    To the answers of Stroud and Trail general replications were filed.    The bond for the $500.00 is in the words and figures following :

"$500.00.

"Twelve months after date, I bind myself, my heirs, &c. to pay Matthew W. Bolton five hundred dollars, it being for land lying in Mercer county, Virginia on Davis fork, waters of Brush creek.    Witness my hand and seal this 15th day of December, 1862.

"W. D. STROUD.    [Seal.]"

A large number of depositions taken by plaintiff and defendant Trail, were read on the hearing on the 13th day of October, 1873.    From these depositions it is clear that the contract of sale was made and the $500.00 bond executed in Mercer county, wherein the land lay and the parties then resided; that Bolton was strongly in sympathy with the cause of the Confederate States, and had unlimited confidence in Confederate states treasury-notes and currency, and that he was in its military service.    One of the defendant's witnesses, the truth of whose statements is not contradicted, testified that : "Said Bolton at one time asked my advice about selling his land, telling me he was going to sell it to Mr. Stroud for $1,000.00 in Confederate money.    I told him he could do as he pleased, but as he had asked me about it, I would be plain with him ; that if I had his land, and was not obliged to have the Confederate money to get along on, I would not give the land for all the Confederate money in the Confederate States of America.    He replied to me after a minute or two, that if he had all the land, he would sell it for Confederate money." The testimony tended to show that in 1862, Confederate currency in Mercer county was rating at par ; that in December 1863 it was rating very low, and was continually depreciating and that about that time, it required eighteen of currency to purchase one of gold ; that the land sold by Bolton to Stroud was on the 15th of December, 1862, worth from $800.00 to $1,000.00 in good money," and was sold by Stroud to Trail for $1,500.00 in Confederate currency.    A son of the defendant Trail testified that in February 1864, when Bolton was at

home on a scout, his mother informed him they had bought from Stroud the land which he had sold to him, and had reserved of the purchase money $500.00 to pay him, and offered him a large amount in Confederate treasury notes which he refused to receive. The deposition of Bolton was taken, and he contented himself with stating that when the trade was made and the note executed nothing was said as to the kind of money in which it was to be paid, but he did not pretend to deny, that the down payment was made in Confederate notes or that the deferred payment was not to be paid in the same currency. The defendant Trail was not examined as a witness, nor was the title bond for Bolton to Stroud, or from Stroud to Trail produced or the contents thereof proved. Other testimony was introduced, tending to show that the sale was in fact for Confederate money.

On the 13th of October 1873, the circuit court entered the following decree.

"And in the same court, on October 20, 1873, in the same cause, this cause came on October 20, 1873, to be heard upon the process regularly executed upon the defendant, upon *the bill* and exhibits regularly filed, upon the amended bill, upon the separate answers of W. D. Stroud, Jacob Trail and the amended answer of Jacob Trail, upon replication to said answers, upon the depositions, and upon arguments of counsel. And the court being of opinion that Mathew Bolton was the agent for the plaintiff as well as for the wife of Bolton, and that he sold the said land to Stroud with reference to Confederate treasury-notes as a currency, and being of opinion that the said bond sued on by the plaintiff, and exhibited with bill for $500.00, was of the value of $350.00, and that the plaintiff has right to recover for the $350.00 as of the day the said bond fell due, to-wit, on Decembr —, 1863; but the court unable to ascertain how much said Stroud has paid to the said Bolton upon the said bond, it is ordered, adjudged and decreed that this cause be referred to R. C. McClaugherty, who is appointed a special commissioner by consent, who shall take an account of the payments made by William D. Stroud to Mathew Bolton, including the $25.00 filed in this cause. And it appearing that defendant Trail claims only 100 of the 200 acres of land sold by Bol-

ton to Stroud, and that this is undivided, it is ordered and decreed that Robert Hall, William Cooper and J. S. Crockett are hereby appointed commissioners to go upon said land and lay off and divide the same into two equal parts, quantity and quality regarded, and they shall assign to defendant Trail that part upon which his improvements shall fall, as far as the same may be done.    And the question as to the interferance of the claim of Cloyd, raised by the answer of Trail, is reserved for the further hearing of this cause.    And when it shall be ascertained what amount is due to the plaintiff, this court will direct a sale of the 100 acres of land assigned to defendant W. D. Stroud, or so much thereof as may be necessary to pay the plaintiff her claim and the costs of this suit; and if the said 100 acres assigned to Stroud be insufficient to raise the sum above decreed, then the court will proceed to sell enough of the 100 acres of land assigned to Trail to raise said sum, but no sale of the land will be directed until the plaintiff and Bolton and wife shall make, properly execute and acknowledge a deed for the land sold Stroud, and file the same with the papers in this cause, to be recorded upon the payment of the purchase-money."

On May 5, 1874, the defendants Bolton and wife tendered and offered to file their joint answer to the plaintiff's bill, admitting a sale of land to Stroud at the price and upon the terms stated but expressly denying that any other or greater portion of the 200 acres owned jointly by the female plaintiff and the respondent Mary Bolton had been sold to Stroud than the 100 acres which he had sold to the defendant Trail, all of which lay on the south side of the Red Sulphur road and that the residue of the 200 acres, is still owned by them, and is in their possession and has never been claimed by any other person.    At the same time the plaintiff tendered and offered to file her amended bill, correcting the description of the land therein alleged to have been sold to Stroud, so as to confine the same to so much of the 200 acres as lies south of the Red Sulphur road, being the same sold by Stroud to Trail.                        . . .

By its decree of May 5, 1874, the circuit court refused to allow said answer and amended bill to be filed, but made the

same, as well as its reasons for such refusal, parts of said decree.

The commissioner, to whom the cause was referred by the decree of October 13, 1873, returned his report April 13, 1874, assuming the $500.00 note to be of the value of $350.00, with interest from December 15, 1863, as ascertained by said decree, submitted three statements of the balance due thereon as of April 7, 1874, showing the same to be respectively $536.17, $496.21 and $542.33, without deciding which ought to be adopted.

On May 9, 1876, the cause was transferred to the circuit court of Summers county, where the plaintiffs filed at rules an amended bill in substance the same as that rejected by the decree of May 5, 1874, which was regularly matured; and on February 17, 1883, the circuit court of Summers county heard the cause upon the original and amended bills, demurrers and several answers thereto, and upon the answer of Jacob Trail filed at this term, depositions, reports of commissioners, exceptions thereto at this date taken, upon the decrees heretofore rendered herein, and all other papers heretofore read, upon consideration whereof, it was among other things adjudged, ordered and decreed, (the defendant Mary Bolton consenting thereto,) that the plaintiffs recover of said Stroud $689.08 and the costs of suit; that the same is a lien on that part of the land in the bill and proceedings mentioned lying on the south side of the Red Sulphur turnpike, and that Stroud never purchased that part of said land lying on the north side of said turnpike road, and provided that unless the said Stroud or some one for him should pay the plaintiffs said moneys, that a special commissioner appointed for the purpose should sell the said land on the usual terms, &c.

From this decree, as well as from decrees of the same court rendered on September 9, 1881, and on February 16, 1882, and from the decrees of the circuit court of Mercer county, rendered on May 6, 1873, and on May 5, 1874, the defendant Jacob Trail obtained an appeal and *supersedeas.*

*J. W. Davis* and *J. M. French* for appellant.

*E. W. Wilson* for appellee.

WOODS, JUDGE:

The appellant has assigned the following errors :

First.—In not referring the cause to one of its commissioners to settle the accounts between the parties and ascertain the value of the Confederate $500.00 that were unpaid.

Second.—The court erred in fixing the value of the $500.00 at $350.00. There was no proof of the value of the land. The Confederate money was, according to the proof, not less than eighteen for one.

The Summers circuit court erred :

Third.—In permitting the amended bill of 1879 to be filed.

Fourth.—It was error to refer the cause to commissioner Peck.

Fifth.—If the cause had been referred, the reference should have been a full one. The commissioner should have been directed to take an account between the parties.

Sixth.—The statute of limitations barred the claim.

Seventh.—W. D. Stroud proves the debt fully paid.

Eighth.—Bailey and wife released Stroud from the payment of the debt, and the release enured to the benefit of Trail, his vendee.

Ninth.—It was error not to dismiss the amended bill.

The last seven errors assigned are easily disposed of. The supposed necessity for the amended bill filed in 1879, grew out of a misapprehension by the court in its decree of October 13, 1873, that the description of the land, in the original bill, alleged to have been sold by Bolton to Stroud, included all of the tract of 200 acres of land owned jointly by the plaintiff and her sister, Máry W. Bolton, instead of only so much thereof as had been sold by Stroud to the defendant Jacob Trail. The original bill described the land sold by Bolton to Stroud as a " tract of land in Mercer county on Davis' fork of Brush creek, adjoining lands of Jacob Lawman and others containing *about* 200 *acres, and is the same land now occupied by said Jacob Trail.*" Whatever land was then occupied by Trail lying in said county on Davis' fork of Brush creek, adjoining the lands of Jacob Lawman and others, was the land sold by Bolton to Stroud, and it was wholly immaterial what number of acres it was supposed to contain. Trail expressly states in his answer that he purchased from Stroud,

and only claims 100 acres, and Stroud testified that he sold to Trail the same land which he had purchased from Bolton, for which he paid down $500.00, and executed said $500.00 bond for residue of the unpaid purchase-money. The joint answer of Bolton and wife, as well as the amended bill, rejected by the decree of May 5, 1874, attempted to correct this supposed mis-description, and the amended bill of 1879, did nothing more, and the court did not err in permitting the same to be filed, although there was no necessity for filing the same as the whole matter was fairly in issue upon the original bill. Neither did the circuit court err in referring the cause to commissioner Peck to hear evidence and make report at its next term whether said Bolton sold to said Stroud the land in the bill and proceedings mentioned, lying on both sides of the Red Sulphur turnpike, or only the land on the south side of said turnpike on which the defendant (Trail) now lives; and to require the title-bond given by Bolton to Stroud to be produced before him, or else accounted for and its contents proved;" for, this was a proper mode of ascertaining the true boundaries of the land sold by Bolton to Stroud, as well as of the parcel sold by Stroud to Trail.

Neither was the plaintiff's demand barred by the statute of limitations, as it was evidenced by a single bill payable on December 15, 1863, while the plaintiff's bill was filed in February, 1871, but little more than seven years thereafter; neither was there sufficient, or any credible evidence showing that the debt had been paid, but on the contrary it is clear that it has not been paid; nor does the defendant Trail either in his answer, or amended answer to the original bill, or in his answer to the amended bill of 1879, pretend that the debt had been paid, but on the contrary as already stated, he tacitly admits that it had not been paid, and that he was liable to pay whatever amount might be ascertained to be justly due thereon. The pretended release, made by the plaintiffs to Stroud dated August 27, 1881, and filed with the deposition of the witness Kitts is neither mentioned nor referred to, in the answers of Trail, nor in any of the pleadings, and was never in issue between the parties; and if it had been, it amounts only to an agreement that if the plaintiffs shall succeed in obtaining the relief prayed for, they would in

case of a sale thereof make the said land lying on the south side of the Red Sulphur turnpike road, bring enough to discharge the amounts decreed to the plaintiffs. For the reasons above stated we are of opinion that the circuit court did not err in regard to the matters referred to in the appellant's last seven assignments of error.

The first and second grounds of error assigned present for our consideration the following questions: What was the true understanding and agreemeent between said Bolton and Stroud in respect to the kind of currency in which their contract for the sale of said land was to be fulfilled or performed, or with reference to which as a standard of value the contract between them was made; and if the same was made with reference to Confederate treasury-notes as a standard of value, and was to be discharged on the part of Stroud by the payment of the value of such currency, how is the value thereof to be ascertained? Is it the actual value in gold of the property sold at the time of the sale; or is it the actual value in gold of Confederate " dollars " mentioned in the said bond of $500.00, at the time the same became payable; or is it the average purchasing power of gold in Mercer county, of all kinds of property real and personal, just before the civil war commenced, as compared with the average purchasing power of Confederate treasury-notes in that county on December 15, 1862, the date of the bond?

The right to show by parol or other relevant testimony the true understanding and agreement of the parties in respect to the kind of currency in which the same was to be fulfilled, has been secured by ch. 116 of the Acts of the Legislature passed on April 7, 1873, by which it is enacted, first: "That in any action, suit or other proceeding for the enforcement of any contract express or implied, where such contract was for the sale or purchase of any real or personal property made, or entered into between May 1, 1861, and May 1, 1865, it shall be lawful for either party to show by parol or relevant testimony what was the true understanding and agreement of the parties thereto either express or to be implied in respect to the kind of currency in which the same was to be fulfilled or performed, or with reference to which as a satndard of value it was made or entered into; and in

an action at law or suit in equity it shall be unnecessary to plead the agreement specially in order to admit such evidence." Second: " Whenever it shall appear that any such contract was, according to the true understanding and agreement of the parties, to be fulfilled or performed in Confederate States treasury-notes, or Virginia treasury-notes, or was entered into with reference to said notes as a standard of value, the same shall be liquidated and settled by reducing the nominal amount due, or payable under such contract in Confederate States treasury-notes, or Virginia treasury-notes to its true value at the time they were respectively made and entered into, or at such other time as may to the court or if it be a jury case, to the jury seem right in the particular case, and upon the payment of the value as ascertained the party bound by such contract shall be forever discharged of and from the same," with a *proviso*, that if any part of such demand has been paid in such treasury-notes, the party making such payment shall have credit for the full amount so paid.

Although neither the bond for $500.00, nor so far as the testimony shows, the title-bond nor contract for the sale of the land, made between Bolton and Stroud expressly provided that the bond was to be discharged in Confederate States treasury-notes, yet as the contract was made in December, 1862, in Mercer county in Virginia, wherein the civil war between the governments of the United States and of the Confederate States, was flagrant, this Court will take judicial notice of the fact that the county of Mercer, in which the land lay, and in which the contracting parties resided was within the jurisdiction of the Confederate States, at the time the contract was entered into, and where the same was to be performed; the natural and reasonable presumption in the absence of all other evidence would be, that the contract was entered into with reference to Confederate States treasury-notes as a standard of value, and was to be performed and fulfilled by payment in such currency. *Simmons* v. *Trumbo*, 9 W. Va. 358; *Gilkeson* v. *Smith*, 15 W. Va. 44. Although the answer of Trail expressly alleged that the land was sold for Confederate States treasury-notes, and that the down-payment of $500.00 was paid in such notes, and the deferred payment of $500.00 was to be so paid, yet none of these

statements are denied, in the answers of Bolton and his wife, or in the original or amended bills, nor in any other manner than by the plaintiff's general replication to the answer of Trail; and when Bolton was examined as a witness he did not deny any of these allegations, but only said, " that neither when the contract was made nor afterwards was anything ever said about its being paid in Confederate money," while it is in proof that Bolton asked the advice of the witness about selling his land, telling him that he was going to sell it to Stroud for $1,000.00 in Confederate money, and afterwards told the witness he had closed the trade, while Stroud testified that he bought the land for $1,000.00 to be paid in Confederate money; that he paid $500.00 of it down and executed his note for $500.00, payable some time afterwards, and sold the same land to Jabob Trail. From these facts and circumstances the circuit court held that said Bolton sold the land to Stroud with reference to Confederate treasury-notes as a currency, and fixed the value of the $500.00 bond at the value of $350.00, as of December 15, 1863, when the same became payable, and this valuation is carried into the decree of the circuit court of Summers county rendered herein on February 17, 1883. It is not very clear from the proofs in this cause, by what mode of calculation the circuit court of Mercer county ascertained the value of the $500.00 bond. The testimony tended to show that when the land was sold on December 15, 1862, it was worth as much as from $800.00 to $1,000.00 in good money, and that Stroud sold it to Trail for $1,500.00 in Confederate money; that in December, 1863, there was no fixed standard of value of Confederate money in Mercer county, but it was very low in value and was constantly falling, while other testimony tended to show that it was worth only about one-eighteenth as much as gold. There was but little evidence to show what was the actual value of Confederate treasury-notes in gold in that county in December, 1862, or what at that time was their purchasing power, of all kinds of property, compared with that of gold just before the commencement of the civil war. It is probable that the circuit court considered the land at the time of the sale as of the value of $850.00, and giving the purchaser full credit for the $500.00 paid down, according to the said

act of the Legislature, treated the $500.00 of unpaid pur-
chase-money, as of the value of the residue of the $850.00,
assumed as the value of the land. Such was probably the
mode adopted by the court, for we are not at liberty to pre-
sume that it disregarded the evidence in the cause upon
this subject, and fixed a mere arbitrary valuation upon the
Confederate States treasury-notes necessary to the ·discharge
of said $500.00 bond.

This precise question was considered by this Court, in the
case of *Beirne* v. *Brown's Adm'r, &c.*, reported in 10 W. Va.
748. The material circumstances in that, were almost identi-
cal with those of this case, except in that the land had been
sold on December 26, 1862, in Monroe county for $25.00 per
acre. That suit like the one under consideration was also
brought to enforce the vendor's lien by a sale of the land for
the unpaid purchase-money. In that case, upon proper de-
fence made, the circuit court held, the sale to have been
made with reference to Confederate States treasury-notes as
a standard of value, and scaled the debt at the rate of $2.72 8-10
Confederate dollars for one in gold, being the value in gold
of Confederate notes, in the city of Richmond, at the date of
said sale. In that case this Court, after a full axamination of
all the cases adjudicated by the court of appeals of Virginia
upon a statute of that State, from which our statute before
cited was copied, construed the statute of this State, and held:
" That the value of Confederate currency at the time it be-
came payable, as compared with gold, should be ascertained
by the average apparent appreciation in value of all kinds of
property real and personal in the county where the same was
sold, at the time when sold for Confederate money as com-
pared with the value of such property just before the war
commenced, when gold was the currency of the country; and
that in ascertaining the value of Confederate currency, the
price at which gold was then selling in Confederate currency
in Richmond or elsewhere in the Confederate States, is not
to be regarded as fixing the relative value of gold and Con-
federate notes." It follows therefore, that neither the actual
value in gold of the property sold, at the time it was sold,
nor the actual value in gold of the Confederate " dollars "
mentioned in the $500.00 bond at the time the same be-

came payable, could be properly assumed as the true value of said $500.00, as of the date of December 15, 1862; but. that the true value thereof should be ascertained and measured by the average purchasing power of gold in Mercer county of all kinds of property, real and personal, just before the civil war commenced, as compared with the average purchasing power of Confederate States treasury-notes in said county on December 15, 1862, when said $500.00 bond was executed.

The circuit court should have referred this cause to a commissioner, to ascertain the true value of $500.00 mentioned in said bond, at the time the same was executed, and ought not to have assumed the actual value of the land at the time of the sale, as in any degree fixing the true value of the Confederate States treasury-notes required to discharge the same.

We are therefore of opinion that there is no error in the decrees of the circuit court of Mercer county rendered herein on May 6, 1873, and on May, 5, 1874, nor in the decrees of the circuit court of Summers county rendered herein on September 9, 1881, and on February 16, 1882, and the same are hereby affirmed; but we are further of opinion, for the reasons hereinbefore stated, that the decree of the circuit court of Mercer county rendered herein on October 13, 1873, and the decree of the circuit court of Summers county rendered herein on February 17, 1883, are erroneous and must be reversed with costs to the appellent against the appellees Enos Bailey and his wife Elizabeth Bailey, and this cause must be remanded to the circuit court of Summers county, with instructions to refer the same to a commissioner to ascertain the true value of the $500.00 bond, upon the principles above stated, and on those settled by this Court in the cause of *Bierne* v. *Brown's administrator, &c.* in 10 W, Va. 748, and to be further proceeded in, according to the principles settled in this opinion, and according to the rules and usages in courts of equity.

REVESED.   REMANDED.